# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **JAMES A. DELANIS**<br><br>    Plaintiff,<br><br>    v.<br><br>**METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY,**<br>**ROBERT J. MENDES, individually and in his capacity as a member of the METRO COUNCIL, and**<br>**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**<br><br>    Defendants. | Jury Demand<br><br><br>**Civil No:** |

## COMPLAINT

Plaintiff James A. DeLanis brings the following causes of action against the Defendants Metropolitan Government of Nashville and Davidson County, Robert J. Mendes, in his capacity as a member of the Metro Council, and Baker, Donelson, Bearman, Caldwell & Berkowitz, PC.

## THE PARTIES

1. Plaintiff James A. DeLanis is a natural person and a citizen of the United States and the State of Tennessee. He resides in Davidson County, Tennessee.

2. The Metropolitan Government of Nashville and Davidson County ("Metro") is a municipality in Tennessee existing in Davidson County, Tennessee. It is organized and existing under the laws of the State of Tennessee. Its chief executive officer is the mayor, who for purposes of this action is John Cooper. Its chief legislative body is the Metro Council.

**3.** Robert J. Mendes is a member of the Council for the Metropolitan Government of Nashville and Davidson County. His office address is 150 3rd Avenue South, Suite 1100, Nashville, Tennessee 37201.

**4.** Baker, Donelson, Bearman, Caldwell & Berkowitz, PC ("Baker Donelson") is a Tennessee professional corporation. It maintains an office in Davidson County, Tennessee. The registered agent for service of process is Sam Blair, Jr., who has a registered address with the Tennessee Secretary of State of 165 Madison Avenue, Memphis, Tennessee 38103-2723.

## JURISDICTION AND VENUE

**5.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and otherwise. This action arises under 42 U.S.C. § 1983 as well other federal and state laws. This Court has supplemental jurisdiction under 28 U.S. Code § 1367 over the state law claims because they arise from the same core set of facts and circumstances as the violations of federal law.

**6.** Venue lies in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to this claim occurred in this district.

## STATEMENT OF FACTS

**7.** DeLanis is an attorney licensed to practice in Tennessee. He has practiced law in Tennessee since 1978 and has been licensed to practice law in Tennessee since 1978.

**8.** DeLanis was employed as an attorney by Baker Donelson, or a predecessor law firm, since 1981, and was so employed at all times relevant to the claims set forth herein.

**9.** In addition to his employment as an attorney with Baker Donelson, the State of Tennessee, acting through the State of Tennessee Election Commission, in 2012 appointed

DeLanis to serve as a member of the Davidson County Election Commission (the "Commission"). See, Tennessee Code Annotated § 2-12-101.

10. Before accepting that appointment by the State, DeLanis obtained Baker Donelson's unqualified approval to accept the appointment to serve on that state commission. Baker Donelson encouraged DeLanis, and other of its attorneys, to be engaged in public service activities like service on the Commission.

11. Before DeLanis accepted the appointment to the Commission, Baker Donelson set up a formal file in its client data base and its conflicts system for DeLanis' work on the Commission. That system is set up to prevent the firm from taking on clients that would create conflicts with existing files and matters. Periodically, DeLanis, and the other lawyers with the firm, filled out questionnaires as requested by Baker Donelson that disclosed to Baker Donelson the positions held by its lawyers on boards and governing bodies of companies and agencies like the Commission. DeLanis completed these disclosure forms as requested and continued to disclose his position on the Commission to Baker Donelson. Because of the public nature of the Commission, DeLanis' position on the Commission was well known to Baker Donelson management.

12. The fact that the Commission, by its nature, was required to take public positions that, at times, were contrary to the wishes, and perceived interests, of Metro as a governing body, and representatives of Metro, was well known to Baker Donelson and its management.

13. The fact that the Commission, by its nature, was required to take public positions that, at times, were contrary to the wishes, and perceived interests, of Metro as a governing body, and representatives of Metro, was well known to Metro as well as it mayor, council members and other policy makers.

**14.** From time to time, DeLanis consulted with John Hicks, who in addition to being a principal of Baker Donelson also served as its "general counsel." The discussions between DeLanis and Hicks included, but was not limited to, issues that were or might come before the Commission and the ethical issues that might be raised by those issues.

**15.** At no time before the circumstances and events that led to the filing of this action, did Baker Donelson or Hicks ever indicate in any way to DeLanis that his position on the Commission presented, or might present, a conflict with his employment at Baker Donelson, a potential conflict with any client of the firm or that it might be grounds for employment termination or discipline by Baker Donelson directed towards DeLanis.

**16.** DeLanis, as an appointed member of the Commission, was a state official with duties set forth by Tennessee law in connection with the administration of elections in Davidson County, Tennessee.

**17.** The Commission is regulated by the State of Tennessee Election Commission. By state statute, the Commission's expenses are funded primarily by Metro, but it also is funded partially by the State of Tennessee. Its structure is designed by state statute with checks and balances so that, assuming proper respect for the law, the Commission can operate independently from Metro in its regulation of elections in Davidson County.

**18.** By state law, the Commission is comprised of 5 members, all of whom are appointed by the State of Tennessee Election Commission. Tennessee Code Annotated § 2-12-101.

**19.** DeLanis was appointed to the Commission in 2012, and every 2 years thereafter.

**20.** DeLanis was elected as Chair of the Commission by his fellow Commissioners in 2016, 2017, 2018, 2019, 2021 and 2022.

**21.** DeLanis was the Chair of the Commission during the events pertinent to the causes of action set forth in the Complaint.

**22.** During DeLanis' service on the Commission, Baker Donelson honored and commended him for his public service, including his service on the Commission. Baker Donelson included a reference to DeLanis' service on the Commission in its website. By its words and actions, Baker Donelson encouraged DeLanis' service on the Commission.

**23.** By state law, the Commission is to be independent from the control of Metro, and its Commissioners, including DeLanis, are to be independent from the control of Metro.

**24.** On information and belief, Metro became a Baker Donelson client after DeLanis was appointed to the Commission.

**25.** During all times relevant to the claims in this action, Metro was a client of Baker Donelson.

**26.** Until the events that led to the filing of this action, Baker Donelson never informed DeLanis that Metro or any of its affiliated agencies and entities had become Baker Donelson clients.

**27.** During all times relevant to the claims in this action, Baker Donelson sought to maintain and increase the client revenue it generated, or could generate in the future, from Metro, and entities related officially and unofficially to Metro.

**28.** In 2020, a group of citizens initiated a petition to place an issue on the ballot in Davidson County, via a referendum vote of the people, concerning a recent 34% property tax rate increase (the "34% Tax Increase") which Metro had enacted. The proposed referendum, among other provisions, would limit the authority of Metro to raise tax rates by more than 5% without voter approval ("Tax Referendum").

**29.** This 34% Tax Increase, which was the subject of the citizen initiated referendum petition, was a matter of great public interest.

**30.** The effort by members of the public to obtain enough signatures on a petition to get a public referendum on the 34% Tax Increase was strenuously opposed by Metro and its public officials including the Mayor, the Metro director of finance and most members of the Metro Council, including Mendes.

**31.** Metro's opposition to a public referendum that would have the effect of rolling back the 34% Tax Increase and/or in any way limiting Metro's authority to impose future tax increases was the official policy adopted by Metro and its officials (the "Metro Anti-Referendum Policy"). This policy directed Metro's actions and the expenditure of enormous sums of money and effort to keep the petition and Tax Referendum effort from ever reaching a public vote. This policy included opposition not only to the efforts to roll back the 34% Tax Increase but to any efforts to limit Metro's ability to prospectively raise taxes.

**32.** On October 9, 2020, the Commission filed a chancery court action in Davidson County because of disputes over whether the 2020 petition regarding the Metro 34% Tax Increase should be placed on the ballot as a public referendum. See, e.g., *Davidson County Election Commission v. The Metropolitan Government of Nashville and Davidson County,* Davidson Chancery No: 20-2012-III. This action was consolidated with *4 Good Government, et al., v. The Davidson County Election Commission, et al.,* Davidson Chancery No: 20-2010-III.

**33.** Based on the Metro Anti-Referendum Policy, Metro and its public officials filed pleadings in the two consolidated lawsuits. Metro's policy objective was to prevent a public referendum on the 34% Tax Increase and to do so through litigation if necessary.

**34.** After a chancery court's 2020 rulings, members of the public attempted to address the problems identified by the chancery court relative to the first petition and started a

second petition effort to obtain a public referendum in 2021 to reverse Metro's 34% Tax Increase and impose future limits on Metro's ability to raise taxes.

35. The continued efforts in late 2020 and 2021 on a petition drive for a proposed Tax Referendum led to more litigation in Davidson County Chancery Court involving claims by and against Metro and the Commission. See, procedural history in *Metropolitan Government of Nashville and Davidson Cnty. v. Davidson Cnty. Election Commission*, 2022 WL 880477 at p.1 (Tenn. App., 2022) ("This case concerns the decision of the Davidson County Election Commission ("the Commission") to hold a referendum election on July 27, 2021, with respect to a petition to amend the Charter of the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro Charter" or "Charter") sponsored by the group 4 Good Government ("4GG"). A previous petition sponsored by 4GG was declared deficient in a 2020 decision by the Davidson County Chancery Court.").

36. On March 26, 2021, Mendes, as a member of the Metro Council, filed Resolution 2021-837 with the Metro Council. This Resolution, with 2 amendments, proposed that additional charter amendments which were offered by Mendes also be placed on the ballot in 2021 but only if the matters contained in the Tax Referendum was placed on the ballot. The Metro Council enacted Resolution 2021-837 on April 20, 2021. The actions of Mendes and other Metro Council members were undertaken and enacted as an official policy of Metro pursuant to and expanding the Metro Anti-Referendum Policy.

37. In Amendment 2 to Resolution 2021-837, which was offered by Mendes, Mendes made clear in the "ballot summary" of the proposed Metro ballot measure that one objective of the Metro proposed charter amendment was to forever preclude any future public referendum on property tax levies or the reversion of property tax levies would be only allowed

to the extent that state law makes, or in the future would make, allowances for such public referendums.  Amendment 2 states, in relevant part,

> I hereby move to amend Resolution No. RS2021-837 by amending the ballot summary for the proposed amendment to the Metropolitan Charter as follows:
>
> This amendment provides that the Metropolitan Government's exercise of power pertaining to government-owned property, and the Council's authority to set property tax levies, are subject to a public referendum only as required by state law, and that any automatic reversion of the property tax levy shall be as specifically authorized by state law. ***

38.      In April of 2021, the Commission engaged, by unanimous vote, election lawyer and Vanderbilt law Professor James Blumstein, along with the law firm Bradley Arant, to represent it in connection with the public's efforts to obtain a second petition to have a public referendum on the 34%  Tax Increase.

39.      The Commission voted on May 10, 2021, and based on the advice of counsel, to place the Tax Referendum on the Davidson County ballot.

40.      Consistent with the Metro Anti-Referendum Policy, Metro opposed and continued to oppose the efforts to place the Tax Referendum on the ballot for a vote by the citizens of Davidson County.

41.      On May 11, 2021, Metro, the Metro Mayor, John Cooper, and the Metro Finance Director, Kevin Crumbo, filed a petition for writ of certiorari and writ of mandamus in a Davidson County Chancery Court. See, *Metropolitan Government of Nashville and Davidson County, et al., v. Davidson County Election Commission*, Davidson County Chancery No: 21-0433-IV (the "2021 Tax Referendum Case")

42.      In the 2021 Tax Referendum Case, Metro asserted that there were deficiencies with the proposed charter amendments and in the petition which deficiencies barred the Tax Referendum from being placed on the ballot.

43. The litigation between Metro and the Davidson County Election Commission included the issue of whether the Commission properly voted to place the Tax Referendum on the ballot.

44. On May 13, 2021, the Commission was conducting an open public meeting which included issues relating to the Tax Referendum. During that meeting, Bob Mendes, a Metro Councilman, berated the Commission over issues related to the Tax Referendum. In his remarks, Councilman Mendes made it clear that he was speaking as a Metro Councilman and in his official capacity as a representative of Metro government. He challenged the independence of the Commission and its lawful authority to regulate the election process if its decisions varied from the directives of Metro government. He also threatened the Commission with retribution if it did not as act demanded by Mendes, the Metro Council, and the Metro. As Mendes stated, "we know who you are and what you are trying to do."

45. The statements by Mendes were made intentionally, with intent to discourage the Commission and individual Commissioners from putting the Tax Referendum on the ballot and were made based on the Metro Anti-Referendum Policy.

46. Shortly after making his May 13, 2021 statements, Mendes inquired into the Commission's ability to retain its own lawyers as it is expressly authorized under Tennessee law. Mendes' inquiries were reflected in a May 25, 2021 email. These inquiries by Mendes were made in furtherance of and consistent with the Metro Anti-Referendum Policy.

47. The assertions by Mendes in his May 25, 2021, communication were made intentionally, with intent to discourage the Commission and individual Commissioners from putting the Tax Referendum on the ballot and were made based on and in furtherance of the Metro Anti-Referendum Policy.

48. On information and belief, at some point prior to or on May 25, 2021, officials with Metro who have authority over such matters as the Metro budget, Metro finances, Metro's position in the state court lawsuits, and the Metro Anti-Referendum Policy contacted one or more principals at Baker Donelson and communicated to Baker Donelson that Metro and these policy makers in their official capacities as Metro officials wanted Baker Donelson to aid and assist Metro in its efforts to keep the Tax Referendum off of the ballot by influencing DeLanis as a Commissioner..

49. The communications between Metro and Baker Donelson, or persons acting on their respective behaves, were made intentionally, with intent to discourage specifically DeLanis, as the Commission chairperson, from taking action to put the Tax Referendum on the ballot and were made based on and furtherance of the Metro Anti-Referendum Policy.

50. On May 25, 2021, John Hicks, acting for Baker Donelson, sent an email to DeLanis using his Baker Donelson email in which he stated, "we need to have a conversation about the current election commission issues and their impact on the firm's representation of Metro".

51. At Hicks' direction, DeLanis met with him in the Baker Donelson offices on the morning of May 26, 2021, at approximately 8:45 AM

52. During that meeting, Hicks made it clear that he was acting on behalf of Baker Donelson and with its authority. During the May 26, 2021 meeting, Hicks berated DeLanis about "the mess I have to clean up," referring to DeLanis' position on the Election Commission.

53. During the meeting on May 26, 2021, Hicks stated that other partners and/or shareholders in Baker Donelson were upset because two major clients of the firm were threatening to pull their business from the firm because of DeLanis' activities and/or votes on the Commission.

**54.** Hicks identified those two clients as Metro and the Metro School Board.

**55.** Hicks stated that there could be a conflict of interest between DeLanis' position on the Commission and Baker Donelson's representation of Metro and its affiliated entities.

**56.** During the May 26, 2021, meeting between DeLanis and Hicks, DeLanis stated to Hicks that attempts to influence the decisions of the Commission could be criminal or illegal acts under Tennessee law.

**57.** On May 26, 2021, Hicks told DeLanis that he should stop using his firm email address for any matters concerning the Commission ('Email Directive"). This was the first notice to DeLanis that there was some issue with using his Baker Donelson email address in connection with Commission business.

**58.** On May 28, 2021, Hicks informed DeLanis that Hicks had determined that there was no conflict of interest between DeLanis' work on the Commission and his work for Baker Donelson. Hicks assured DeLanis that he need not be concerned about that issue and that Hicks would work this out with the firm's clients.

**59.** On June 22, 2021, the Davidson County Chancery Court, in the Tax Referendum Case, held that the petition for the Tax Referendum was defective and that the referendum should not be placed on the ballot.

**60.** The trial court's June 22, 2021, ruling was favorable to Metro, the Mayor, its finance director and members of the Council, including Mendes, who were implementing and pursuing the Metro Anti-Referendum Policy.

**61.** Metro, acting through officials having authority over the referendum litigation, opposed any efforts by the Commission to appeal the trial court's June 22, 2021, ruling. Such a plan by Metro was based upon and consistent with the Metro Anti-Referendum Policy.

**62.** The Commission scheduled a public meeting to be held on June 25, 2021, for the Commission to consider and to vote on whether to appeal the Court's June 22, 2021 ruling in the Tax Referendum Case.

**63.** A successful appeal by the Commission of the June 22, 2021, ruling would be adverse to Metro's Anti-Referendum Policy.

**64.** On information and belief, at points prior to and potentially after the Commission's actions on June 25, 2021, officials with Metro who have authority over such matters as the Metro budget, Metro finances, Metro's position in the state court lawsuits, and the Metro Anti-Referendum Policy contacted one or more principals at Baker Donelson and communicated to Baker Donelson that they wanted it to assist Metro in its efforts to keep the Tax Referendum off of the ballot and to ensure that the Commission did not vote in favor of appealing the June 21, 2021 order. On information and belief, one or more of said communications between Metro to Baker Donelson, were made by or at the direction or in joint effort with Mendes in his capacity as an official with Metro.

**65.** The communications between Metro and Baker Donelson were made intentionally, with intent to discourage specifically DeLanis, as the Commission chairperson, from taking action to appeal the trial court's June 21, 2021, ruling and/or to otherwise put the Tax Referendum on the ballot.

**66.** On June 24, 2021, Hicks emailed DeLanis and requested that DeLanis call Hicks. When DeLanis called Hicks, Hicks "asked" DeLanis, as a Commission member, not to vote on the appeal of the decision on the Tax Referendum. By his statements during that telephone conversation, Hicks was aware that the Commission was to vote on that appeal the next day and that, if DeLanis did not vote, the appeal would be rejected due to a deadlock on the

Commission. In other words, Hicks was aware that he was requesting DeLanis to act or omit to act in order to assure that the Commission's appeal would not occur.

67. When DeLanis would not give Hicks an answer on how he would vote on the appeal, or what other action he would take, Hicks told DeLanis to think it over and that he wanted to meet with DeLanis the next morning, which meeting would be before the planned Commission meeting.

68. Also on June 24, 2021, Mendes sent a letter (the "June 24 Mendes Letter") by email to the entire Commission, and Metro Council, and upon information belief, distributed that letter so that it would be given as wide coverage and dissemination as possible by the media and otherwise. Mendes was acting as an official and councilman of Metro and was also acting in furtherance of the Metro Anti-Referendum Policy.

69. The June 24 Mendes Letter was on official Metro Council letterhead and Mendes signed that letter as "Metro Council, At Large member."

70. In his letter, Mendes urged the Commission not to appeal the Chancery Court June 21, 2021, ruling which had blocked, for a second time, the Tax Referendum from being placed on a public ballot.

71. In his letter, Mendes accused DeLanis, as the chairman of the Davidson County Election Commission, of "conducting a pre-baked political circus that was fundamentally anti-democracy."

72. In his letter, Mendes attacked DeLanis:

> I do not need to tell any of you how pre-baked the Commission's process was. You lived through it. I believe that you already know that Chair DeLanis's intentions from the start were to push the referendum onto a ballot no matter what. I believe you know that instead of letting unbiased legal advice dictate the conclusion, Chair DeLanis's preferred conclusion dictated what the legal advice was going to be.

In addition, in his letter, Mendes stated:

> For reasons that seem hyper-partisan, Chair DeLanis didn't like the answers he was getting from Bill Koch, Bob Cooper, or Chancellor Lyle. So Chair DeLanis decided instead to have the Commission fire Bill Koch and get the answers he wanted from Jim Blumstein,

73.    Mendes thus asserted in his letter that DeLanis dictated to the Commission that it fire Bill Koch as its attorney. That statement was false; Mendes had no basis to believe that statement was true; and Mendes was aware that the statement was false.

74.    Mendes made that false statement knowingly, maliciously, and/or with reckless disregard for its truth or falsity.

75.    Mendes also stated, in effect, that DeLanis determined in advance what legal advice Professor Blumstein would give to the Commission concerning the Tax Referendum and then dictated to the Commission that it hire Professor Blumstein in order to achieve a pre-ordained politically partisan result.

76.    That statement and that allegation was false; Mendes had no basis to believe that statement was true; and Mendes was aware that the statement was false. Mendes made that false statement knowingly, maliciously and/or with reckless disregard for its truth or falsity.

77.    The communications and statements by Mendes on June 24, 2021, were pursuant to and in furtherance of the Metro Anti-Referendum Policy.

78.    On information and belief, Mendes and/or other members of Metro or government entities affiliated with Metro, which officials had authority over these issues, (the "Metro Officials") had been in contact with Baker Donelson regarding the Metro Anti-

Referendum Policy, including specifically the Commission potential appeal of the June 22, 2021, ruling.

79.     On information and belief, Metro Officials, including but not limited to Mendes, communicated to Baker Donelson that Metro wanted to ensure the Commission did not vote to appeal the chancery court ruling that, absent an appeal, blocked the taxpayer petition for the Tax Referendum from a public vote.

80.     On information and belief, Metro Officials, including but not limited to Mendes, communicated to Baker Donelson that Metro wanted, and that it wanted the firm's assistance, to make certain that DeLanis vote against the appeal, that he abstain from the vote, or that he resign from the Commission -- all of which would leave only 4 voting members on the Commission and would result in an anticipated deadlocked 2-2 vote. This would have blocked an appeal and would have thereby blocked the Tax Referendum from being placed on the ballot for a public vote.

81.     On the morning on June 25, 2021, Hicks, using his Baker Donelson email, sent an email at 7:02:46 AM directing DeLanis to "be in the office by 8 or 8:15 at the latest" and stating that "We should talk as early as we can after that."

82.     In response, DeLanis sent an email using his Baker Donelson email, to Hicks on June 25, 2021, at 7:43 AM in which he stated, in part:

> Dear John, Please inform me in writing of the purpose of the meeting. If this meeting is to speak to me again about my vote at the election commission meeting today, I am not comfortable with that. As I have expressed to you before, further discussions of that nature may put the law firm and its clients in a questionable legal position.

83.     After a series of emails between DeLanis and Hicks which were copied to senior Baker Donelson management, on June 27, 2021, Hicks directed DeLanis to meet with him at the firm on Monday morning, June 28, 2021, at 9:00 AM.

**84.** On Monday morning, June 28, 2021, at 7:12 AM DeLanis sent an email to Hicks and other  members of senior Baker Donelson management, in which he stated, in pertinent part:

> You have told me several times now that two firm clients (Metro Nashville and the Metro School Board) have been pressuring you, and the firm, to take action against me because of my role on the Election Commission. In my opinion, that implicates serious legal and ethical issues. I should not have to consider those issues is a rushed fashion without the opportunity to consult counsel. Why don't we postpone all this until sometime after the upcoming fourth of July holiday?

**85.** Hicks refused to postpone the meeting and to allow DeLanis to have an attorney at the meeting.

**86.** Hicks sent an email to DeLanis at 4:06 PM on June 28, 2021, in which he stated: "The meeting will occur at 8:00 tomorrow.  You are still employed by the firm, so please come in to discuss that employment with me, your practice group chair and the office managing shareholder.  If you have counsel, he or she is not invited to attend and would not be if the meeting occurred at any other time."

**87.** At Hicks' directive, DeLanis attended that meeting on Tuesday, June 29, 2021. DeLanis was denied his request to have a lawyer represent him at that meeting counsel. Delanis was terminated by Baker Donelson as an employee at that time and was given until that Friday to clean out his office at the firm.

**88.** In an email dated June 29, 2021, at 10:03 AM, after Baker Donelson had terminated his employment, Hicks wrote to DeLanis, which he copied to other members of Baker Donelson senior management, and claimed that the names of those who  tried  to influence DeLanis' vote on the Commission, was  privileged attorney client information:

> Please remember that, as a firm lawyer, Metro Government and the related entities are your clients, as well as the firm's clients.  None of us can discuss or comment to third parties on any communications the firm may have had with any of our clients.  To do otherwise would be an

ethical violation.

89.     Baker Donelson, through Hicks, through a claim of a legal ethical privilege, and by a threat of ethical complaint, demanded that DeLanis remain silent about the potentially illegal and criminal behavior of Metro, its representatives, and Baker Donelson.

90.     Despite being admonished by DeLanis that he had not retired and that Baker Donelson had no authority to state that he had retired, Baker Donelson told one or more news media outlets that DeLanis had retired from the firm.

91.     The assertion that DeLanis had retired from Baker Donelson was false. Baker Donelson had no factual basis to make that assertion. Baker Donelson and Hicks knew that assertion was false.

92.     The termination of DeLanis by Baker Donelson was inconsistent with the firm's typical policies and procedures regarding the continued employment of senior counsel, such as DeLanis, particularly when such counsel had ongoing client matters, including pending litigation, that they were involved with.

93.     Baker Donelson terminated DeLanis in retaliation for his actions related to the acts of the Commission, including but not limited to the vote of the Commission to appeal the June 21, 2021, trial court ruling.

94.     Baker Donelson's termination of DeLanis was motivated, on information and belief, by and pursuant to the demands and requests made by Metro and Metro Officials on the firm which were made by it and its officials pursuant to the Metro Anti-Referendum Policy.

95.     During all times pertinent to this case, Hicks acted as a member of Baker Donelson senior management and not as a lawyer representing Baker Donelson.

96.     DeLanis continues to serve on the Commission in 2022.

97. Metro and Mendes have continued to pursue and enforce the Metro Anti-Referendum Policy in 2022. For example, the Metro Council adopted Resolution RS2022-1475 on May 5, 2022, in furtherance of that policy a proposed charter amendment. That resolution would prohibit any citizen petition or referendum effort from being placed on any future ballot to amend the Metro Charter unless "the substance of the proposed amendment is not subject to a referendum under state law or this Charter." Thus, in the absence of a state law which expressly authorizes by citizen petition a public referendum to reduce, limit or regulate the local taxing authority of a local government, no such citizen initiated petition would be allowed in the future if the proposed Metro charter amendment is adopted.

98. The Metro Anti-Referendum Policy as proposed by Metro not only seeks to limit and chill the First Amendment rights of DeLanis and others citizens of Nashville, it also seeks to infringe and restrict the constitutionally protected right under the First Amendment and otherwise regarding the natural rights of citizens to seek to alter, amend or abolish as existing federal, state or local government under the "Right of the People to alter or to abolish it, and to institute new Government, laying its Foundation on such Principles, and organizing its Powers in such Form, as to them shall seem most likely to effect their Safety and Happiness", See, Declaration of Independence, see also, Tennessee Constitution, Article I, § 1 ("That all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, and happiness; for the advancement of those ends they have at all times, an unalienable and indefeasible right to alter, reform, or abolish the government in such manner as they may think proper.")

99. The acts and failures to act by Baker Donelson and/or Metro, and/or their representatives, potentially violated numerous criminal laws of the State of Tennessee and the United Stated of America, including without limitation, one or more of the following: Tenn.

Code Ann. § 39-14-112, *et seq.*(Extortion), Tenn. Code Ann. § 39-16-102, *et seq.* (Bribery Of A Public Servant), Tenn. Code Ann.§ 39-16-105 (Buying And Selling Of Office), Tenn. Code Ann. §2-19-103 (Interference With Another's Duties Or Rights), Tenn. Code. Ann. § 2-19-125 (Bribing Election Officials), Tenn. Code. Ann. § 2-18-115 (Violence Or Intimidation To Prevent Voting), Tenn. Code. Ann. § 2-19-134 (Coercing Or Directing Employees To Vote For Measure, Party Or Person), Tenn., Code. Ann. § 2-19-202 (Interference with Election or Nomination), Tenn. Code. § 39-12-101(Attempts), Tenn. Code Ann. § 39-12-102 (Solicitation), Tenn. Code Ann. § 39-12-103 (Conspiracy), Tenn. Code. Ann. § 39-11-402 (Aiding and Abetting, and Facilitating a Felony), Tenn. Code Ann. § 39-11-404 et. seq. (Corporate Liability), and 42 U.S.C. § 242 (Deprivation of Rights Under Color of Law).

**COUNT I**
**U.S. CONST., AMENDS. I AND XIV, 42 U.S.C. § 1983**

**100.** DeLanis as a citizen has a right protected by the First and Fourteenth Amendments to the United States constitution to engage in free speech and free association. Similarly, the individual rights of freedom of speech and the freedom of association are also protected constitutionally and as part of the public policy of the state of Tennessee. See, Tennessee Constitution Article I, §§ 19, 23.

**101.** The right of free speech includes the right to express opinions on matter of public interest or debate.

**102.** The rights of free speech and freedom of association include the right to accept appointments to serve on state boards and commissions and, if so appointed, to express public opinions on matters that come before those bodies. See, e.g., *Murphy v. Cockrell*, 505 F.3d 446, 451 (6th Cir. 2007) r'hrg denied (2007)

**103.** The rights of free speech and freedom of association include the right to accept appointments to serve on state boards and commissions and, if so appointed, to vote publicly on matters that come before those bodies. See, e.g., *Murphy v. Cockrell*, 505 F.3d 446, 451 (6th Cir. 2007) r'hrg denied (2007)

**104.** The rights of free speech and freedom of association include the right to be free from retaliation and/or adverse employment action taken by government entities, government officials and private employers (when acting as state actors or when acting under circumstances where the conduct is entwined or entangled with a government entity).

**105.** The rights to express public opinion and to vote on matters as a member of a public board or commission are rights that are protected under both federal and state law.

**106.** The right to due process under the law includes the right of DeLanis, as an appointed state official to serve on a commission having both administrative and quasi-judicial functions, to effectively fulfill his oath of office to consider and vote on matters coming before the Commission without illegal or inappropriate influence or duress that would be in violation of the Due Process and/or Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 and otherwise under the United States Constitution and/or federal law.

**107.** Metro acting through its public officials and Mendes had implemented the Metro Anti-Referendum Policy to oppose the efforts to place the Tax Referendum on the ballot which policy included efforts by Metro to oppose and discourage the Commission and its Commissioners, who were state officials, from voting to appeal the June 21, 2021, trial court ruling and which policy also included proposed ballot issues written by Mendes and enacted by the Metro Council that would forever prohibit public referendum on certain tax issues unless authorized by state law.

**108.** On information and belief and out of caution that Metro may claim that Mendes was not acting within the scope of his duties as an elected official on the Metro Council, Mendes is sued in this action not only in his official capacity but also in an individual capacity acting under the color of law.

**109.** Metro acting through its public officials, who are presently unknown to DeLanis but who, on information and belief include Mayor John Cooper, and/or Mendes, violated his rights by attempting to intimidate or coerce him, by publicly threatening Commission members and/or by placing his private employment at risk, in order to cause him to either vote against efforts to place the public referendum on the ballot or to take other action to increase the probability that the Commission would not vote to appeal the June 21, 2021 trial court decision.

**110.** The First Amendment to the United States Constitution, applies against Metro and Mendes, by operation of the Fourteenth Amendment.

**111.** DeLanis has been damaged in violation of 42 U.S.C. § 1983.

**112.** DeLanis is entitled to declaratory and permanent injunctive relief against Metro, its officials and Mendes to the extent that they seek to intimidate, harass or coerce him individually and/or in his capacity as an appointed public official serving on a state commission in violation of the First and Fourteenth Amendments.

**COUNT II**
**U.S. CONST., AMENDS. I AND XIV, 42 U.S.C. § 1983**
**AND VIOLATION OF STATE LAW**

**113.** Tennessee Code Annotated § 2-19-202 makes it unlawful for one public official to use their office to attempt to intimidate, coerce or command another public official to vote for or against any measure:

§ 2-19-202. Interference with election or nomination

(a) It *is unlawful for any public officer or employee to use such person's official position, authority or influence to* interfere with an election or nomination for office or *directly or indirectly attempt to intimidate, coerce or command any other officer or employee to vote for or against any measure,* party or person, or knowingly receive or pay assessments of any kind or character for political purposes or for election expenses from any other officer or employee.

(b) *It is the intent of this section to prohibit any political intimidation or coercion of any public officer or employee.*

(emphasis added)

114.    Metro acting through public officials, who are presently unknown to DeLanis but who, on information and belief include Mayor John Cooper, and/or Mendes, violated DeLanis' rights as protected by the First and Fourteenth Amendments, which are consistent with the public policy protections set up under Tennessee Code Annotated § 2-19-202, by attempting to intimidate or coerce him, by publicly threatening Commission members and/or by placing his private employment at risk, in order to cause him to vote against efforts to place the public referendum on the ballot or to take other action to increase the probability that the Commission would not vote to appeal the June 21, 2021 trial court decision.

115.    Metro acting through public officials, who are presently unknown to DeLanis but who, on information and belief include Mayor John Cooper, and/or Mendes, violated his rights as protected by the First and Fourteenth Amendments by attempting to intimidate or coerce him, by directly or indirectly seeking to illegally intimidate or coerce him in violation of the Equal Protection clause of the Fourteenth Amendment to force him to vote against or abstain from voting on efforts to place the public referendum on the ballot.

116.    On information and belief and out of caution that Metro may claim that Mendes was not acting within the scope of his duties as an elected official on the Metro Council, Mendes

is sued in this action not only in his official capacity but also in an individual capacity acting under the color of law.

117. DeLanis has been damaged in violation of 42 U.S.C. § 1983.

118. DeLanis is entitled to declaratory and permanent injunctive relief against Metro, its officials and Mendes to the extent that they seek to intimidate, harass or coerce him individually and/or in his capacity as an appointed public official serving on a state commission in violation of the First and Fourteenth Amendments.

**COUNT III**
**JOINT ACTION / CIVIL CONSPIRACY**
**TO VIOLATE CONSTITUTIONALLY PROTECTED RIGHTS**

119. Defendants Metro, acting through its public officials, Baker Donelson and, on information and belief, Mendes, acted in an unlawful conspiracy and/or in cooperation with each other to injure DeLanis by infringing upon his civil rights as established and protected by the First and Fourteenth Amendments. See, *Memphis, Tennessee Area Local, American Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004).

120. Metro, Baker Donelson and, on information and belief, Mendes acted in agreement to coerce, intimidate or otherwise illegally pressure DeLanis in order to wrongfully influence his speech, his vote and/or his conduct as a state official serving on a Commission having jurisdiction over one or more issues opposed by Metro.

121. Metro, Baker Donelson and, on information and belief, Mendes shared in the objective that it was in their mutual best interests, particularly in light of the financial and attorney-client relationship that existed between Metro and Baker Donelson, to deprive DeLanis of constitutionally protected rights and state law protections in order to achieve their mutual goal of ensuring that the Commission did not move forward with an appeal of the chancery court

decision and otherwise did not move forward to put the citizen petition initiated referendum on the ballot.

122. Metro, Baker Donelson and, on information and belief, Mendes undertook specific overt acts by directing and intimidating DeLanis, including threats of termination of employment, should he not act in accordance with the objectives and agreement that Metro, Baker Donelson and, on information and belief, Mendes had reached regarding defeating the referendum effort.

123. At all times material, Baker Donelson was acting through its board members, officers, agents, servants, and employees, and specifically through Hicks.

124. At all times material, Metro was acting through its officials, employees, and agents, and, on information and belief, specifically through, but not limited to, Mendes.

125. The acts and conduct of Baker Donelson as alleged in this complaint were done with the specific intent of pressuring DeLanis to act or refrain from acting as Metro, Baker Donelson and, on information and belief, Mendes jointly desired with respect to the Tax Referendum and the Metro Anti-Referendum Policy.

126. The acts and conduct of Baker Donelson as alleged in this complaint were done in willful participation, cooperation and/or conspiracy with Metro and Mendes and thus under color of state law.

127. Baker Donelson, acting under pressure from Metro and, on information and belief, Mendes, in light of its business relationship with Metro and which it viewed as an important client, acted knowingly and intentionally to pressure, intimidate and coerce DeLanis, as an employee of the firm but who was known by it to also be acting in the capacity as an appointed state official, to vote, abstain from voting or resign from the Commission in order to a) cause the Commission not to appeal a chancery court ruling and/or b) to take other action that

was intended by Metro, Baker Donelson and, on information and belief, Mendes to ensure that a citizen initiated referendum be precluded from a public vote.

128. Metro, Baker Donelson and, on information and belief, Mendes acted intentionally or with recklessly disregard for the constitutional rights of DeLanis as an appointed state official, which rights were protected by the First and Fourteenth Amendments to the Constitution of the United States as well as by one or more state laws.

129. As a direct and proximate result of the wrongful conduct of Metro, Baker Donelson and, on information and belief, Mendes as alleged above, DeLanis was wrongfully terminated from his private employment while he had active litigation pending and prior to his intended plan for retirement.

130. On information and belief, it was intended by Metro and, on information and belief, Mendes, that Baker Donelson would take adverse employment action against DeLanis in order to intimidate him to act or refrain from acting as desired and/or it was reasonably foreseeable to Metro and Mendes that Baker Donelson would do so in light of Metro's client status with Baker Donelson.

131. The acts of Metro, Baker Donelson and, on information and belief, Mendes deprived DeLanis of his right to be free from the use of excessive or illegal intimidation or coercion and otherwise deprived him of due process of law in violation of the rights, privileges, and immunities guaranteed to him under the First and Fourteenth Amendments to the Constitution of the United States.

132. Baker Donelson's actions in concert with Metro and Mendes were so entwined with the Metro Anti-Referendum Policy were such that Baker Donelson's conduct was conduct undertaken by it under color of law.

**133.** On information and belief and out of caution that Metro may claim that Mendes was not acting within the scope of his duties as an elected official on the Metro Council, Mendes is sued in this action not only in his official capacity but also in an individual capacity acting under the color of law.

**134.** DeLanis has been damaged in violation of 42 U.S.C. § 1983.

**135.** DeLanis is entitled to declaratory and permanent injunctive relief against Metro, its officials, Mendes and Baker Donelson to the extent that they seek to intimidate, harass or coerce him individually and/or in his capacity as an appointed public official serving on a state commission in violation of the First and Fourteenth Amendments.

**COUNT IV**
**BAKER DONELSON OPERATING AS A STATE ACTOR**
**TO VIOLATE CONSTITUTIONALLY PROTECTED RIGHTS**

**136.** Baker Donelson engaged in its conduct, as alleged herein, directed toward DeLanis in circumstances that render it a state actor under the "state compulsion test" which exists when a government actor, such as Metro and/or Mendes, significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice of action is really that of the state. Finally, the nexus test requires a sufficiently close relationship between the state and the private actor so that the action taken may be attributed to the state. See, *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992).

**137.** Baker Donelson engaged in its conduct, as alleged herein, directed toward DeLanis in circumstances that render it a state actor in that there was a close entanglement and/or relationship involving Metro and Baker Donelson such that the law firm's intimidation and coercion of DeLanis, which was undertaken pursuant to the Metro Anti-Referendum Policy, should be attributed to Metro. See, *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992).

**138.** DeLanis has been damaged in violation of 42 U.S.C. § 1983.

**139.** DeLanis is entitled to declaratory and permanent injunctive relief against Metro, its officials, Mendes and Baker Donelson to the extent that they seek to intimidate, harass or coerce him individually and/or in his capacity as an appointed public official serving on a state commission in violation of the First and Fourteenth Amendments.

## COUNT V
## RETALIATORY DISCHARGE

**140.** Tennessee Code Annotated § 50-1-304 provides that an employee shall have a cause of action against an employer to the extent that the employer retaliates against the employee under circumstances set forth in the statute.

**141.** The operative facts of this claim arise from the same facts as alleged in the preceding counts.

**142.** At all times in question, DeLanis was an employee of Baker Donelson.

**143.** Baker Donelson was prohibited from discharging or terminating DeLanis as an employee for refusing to participate in, or for refusing to remain silent about, illegal activities.

**144.** Baker Donelson, in coordination with and to appease Metro, a client a of the firm, and Mendes, an outspoken Metro official, attempted to pressure DeLanis to unlawfully and illegal engage in conduct intended to cause the Commission not to vote on whether to appeal the trial court's ruling regarding the Tax Referendum and/or to take actions intended to cause such Commission, if it did vote, to have a tie vote. When DeLanis refused to submit to the pressure being exerted by Baker Donelson, Mendes, and Metro, Baker Donelson fired DeLanis.

**145.** Baker Donelson's motivation in terminating DeLanis as an employee included the fact that he had stated to Hicks that attempting to intimidate a state official, such as a Commissioner, relative to a matter that was to be acted upon by the Commission, may be a

criminal act under Tennessee law and that he was unwilling to comply with or submit to such intimidation.

146. Baker Donelson terminated DeLanis as a sole result of his refusal to agree to take action or fail to take action as a Commission member which would ensure that the Tax Referendum did not go on the ballot and that the Commission did not appeal from the trial court's June 22, 2021, ruling.

147. As a result of being wrongfully terminated by Baker Donelson, DeLanis has been damaged which damage includes, but is not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

148. As a result of being wrongfully terminated by Baker Donelson, DeLanis is entitled to recover his attorney's fees and costs pursuant to Tennessee Code Annotated § 50-1-304.

## COUNT VI
## INJURIOUS FALSEHOOD
## AND INTERFERENCE WITH BUSINESS OPPORTUNITY

149. The operative facts of this claim arise from the same facts as alleged in the preceding counts.

150. At all times in question, DeLanis was an employee of Baker Donelson.

151. Baker Donelson terminated DeLanis as an employee.

152. Baker Donelson's termination of DeLanis as an employee was made in violation of the existing policies, procedures and practices of the firm which historically did not result in adverse action directed towards a senior member and former equity partner of the firm even if such individual was transitioning voluntarily to full retirement.

**153.** Baker Donelson made on one or more occasions a false statement of fact in which it claimed that DeLanis "retired" from the firm. Baker Donelson knew that the statement was false or, at a minimum, operated with reckless disregard for the fact that the statement was false.

**154.** Baker Donelson's false statement that DeLanis had retired was made not only to conceal the firm's termination of DeLanis but to further conceal the factual basis on which it terminated him.

**155.** Baker Donelson's false statement that DeLanis had retired was made, on information and belief, with the knowledge and intent that it would cause DeLanis harm and impairment in trying to obtain a lateral move to another law firm, in trying to maintain a practice as a sole proprietor and in any efforts to keep existing and/or develop new business after his termination.

**156.** DeLanis has been damaged by the false assertion by Baker Donelson that he had retired.

**PRAYER FOR RELIEF**

Plaintiffs request judgment be entered in their favor and against Defendants as follows:

**1.** An order permanently enjoining Metro, its officials, officers, agents, servants, employees, and all persons in active concert or participation with it, including Mendes and Baker Donelson, from seeking to illegally or unlawfully coerce or intimidate DeLanis in his capacity as a state official serving on the Commission.

**2.** For an award of compensatory damages in an amount to be determined at trial but not less than $1,000,000.

**3.** For an award of punitive damages in an amount to be determined at trial.

**4.** Attorney fees and costs pursuant to 42 U.S.C. § 1988 and as may otherwise permitted by law.

**5.** For any other declaratory relief to which DeLanis may be entitled.

**6.** Costs of suit.

**7.** Any other further relief as the Court deems just and appropriate.

Respectfully submitted:

 \s\ John I. Harris III
John I. Harris III – 12099

**Schulman, LeRoy & Bennett PC**
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
Tel: (615) 244-6670
jharris@slblawfirm.com