IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| **JAMES A. DELANIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00469** |
| | ) | |
| **METROPOLITAN GOVERNMENT OF** | ) | **District Judge Richardson** |
| **NASHVILLE AND DAVIDSON** | ) | **Magistrate Judge Frensley** |
| **COUNTY, ROBERT J. MENDES,** | ) | |
| **individually and in his capacity as a** | ) | |
| **member of the METRO COUNCIL,** | ) | |
| **and BAKER, DONELSON,** | ) | |
| **BEARMAN, CALDWELL &** | ) | |
| **BERKOWITZ, PC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF METRO DEFENDANTS' MOTION TO DISMISS

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants, the Metropolitan Government of Nashville and Davidson County ("Metropolitan Government") and Metropolitan Councilmember Bob Mendes,[1] move to dismiss all claims against them for failure to state a claim upon which relief may be granted.

This case arises out of events surrounding two failed efforts to propose amendments to the Metropolitan Charter in 2020 and 2021 by petition for a referendum election. These petitions were presented to the Davidson County Election Commission ("DCEC") for consideration of whether they should be placed on the ballot. Plaintiff Jim DeLanis served on the DCEC at the time, made public statements concerning the petitions, and voted to put the second one on the ballot for a July 27, 2021, referendum election. Both petitions generated

---

[1] Councilmember Mendes's full name is Robert J. Mendes. He holds elected office as "Bob Mendes."

{N0488810.3}

litigation, at the significant expense of the Metropolitan Government. Plaintiff now claims that various Metropolitan Government officials, mostly unnamed but including Councilmember Mendes, conspired with DeLanis's then-employer, Defendant Baker, Donelson, Bearman, Caldwell, and Berkowitz, PC ("Baker Donelson"), to prevent DeLanis from taking certain positions while serving on the DCEC in violation of DeLanis's constitutional rights. But Plaintiff's Complaint fails to state a claim against the Metropolitan Government or Councilmember Mendes (collectively, "Metro Defendants").

Plaintiff asserts the same claims against both the Metropolitan Government and Councilmember Mendes in his official and individual capacities in Counts I through III of the Complaint. Those claims, all brought pursuant to 42 U.S.C. § 1983 ("Section 1983"), include: a First Amendment claim alleging retaliation for Plaintiff exercising his free speech and freedom of association rights (Count I); an unspecified "Due Process" claim (Count I); an unspecified "Equal Protection" claim (Count I); a claim alleging violation of Tenn. Code Ann. § 2-19-202 (Count II); and a civil conspiracy to violate constitutional rights claim (Count III).

All claims fail on the pleadings. First, the "official capacity" claims in Counts I through III against Councilmember Mendes are wholly duplicative of the same claims against the Metropolitan Government and should be dismissed. Second, Councilmember Mendes is entitled to absolute immunity for most of the alleged violations here, which arose during his legislative actions. In fact, to find that Councilmember Mendes retaliated under the First Amendment for expressing views on public, political issues would be to infringe on *his* First Amendment rights. Such a conclusion would have very dangerous consequences, chilling local legislators—the representatives of the people—in ways that the democratic process never intended. The First Amendment's protection swings both ways, and local legislators must be able to advocate for the people they represent as part of their legislative duties without fear of liability.

Third, Plaintiff's claims for First Amendment retaliation in Count I fail because the Complaint contains no well-pleaded facts to establish that any Metro official took an adverse action against him. Fourth, Plaintiff pleads Equal Protection and Due Process claims only in passing and alleges no facts to support such claims. Fifth, Plaintiff's attempt to allege state law violations via Section 1983 in Count II fails because Section 1983 does not permit such claims and the Tennessee statute on which Plaintiff relies provides no private right of action. Sixth, Plaintiff's civil conspiracy claims in Count III fail because his underlying constitutional claims fail. Seventh, Councilmember Mendes is entitled to qualified immunity for all constitutional claims alleged in this case because there was no clearly-established law that would have put him on notice that his specific actions at the time violated DeLanis's rights. Finally, the claims in all three counts must be dismissed as to the Metropolitan Government because Plaintiff has not pleaded facts sufficient to establish that an unconstitutional Metropolitan Government policy caused Plaintiff injury or that a final policymaker for the Metropolitan Government violated Plaintiff's constitutional rights.

For these reasons, discussed in more detail to follow, Plaintiff fails to state a claim against the Metro Defendants, and they should be dismissed from this action.

## STATEMENT OF FACTS

In 2020, the Metropolitan Government passed a tax increase. (Compl. ¶ 28, Doc. No. 1.) In response, a citizen's group called 4 Good Government circulated and filed a petition to amend the Metropolitan Charter by referendum election ("First Tax Referendum Petition"). (*Id.* ¶¶ 28, 35.) Among other items, the proposed Charter amendments sought to reverse the tax increase and limit the Metropolitan Government's authority to raise tax rates by more than 5% without voter approval. (*Id.* ¶¶ 28, 31.)

When considering the First Tax Referendum Petition, the DCEC exercised its right to request a declaratory judgment from the Chancery Court on whether the petition qualified

for the ballot. (*See 4GoodGovernment v. The Davidson Cty. Election Comm'n*, Case No. 20-1010-III, Findings of Fact and Conclusions of Law at 9-10 ("Petition 1 Slip op."), attached to Motion as Exhibit 1[2]; Compl. ¶¶ 21, 32 (referencing the litigation).) The Metropolitan Government also moved to enjoin the DCEC from placing the First Tax Referendum Petition on the ballot because of its numerous fatal defects. (Petition 1 Slip op. at 9-10, Mot. Ex. 1.)

The DCEC is comprised of five commissioners and is responsible for facilitating elections in Davidson County. Tenn. Code. Ann. § 2-12-101. Like all election commissions in the State of Tennessee, the DCEC is a political body comprised of three members of the majority political party and two members of the minority political party, which are all appointed by the State election commission. *Id.* § 2-12-101, -103. Before an election is held, county election commissions must fulfill their ministerial and quasi-judicial duties. *McFarland v. Pemberton*, 530 S.W.3d 76, 89-94 (Tenn. 2017). Plaintiff is a State-appointed, DCEC commissioner. (Compl. ¶ 9.)

---

[2] Typically, "[m]atters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997). The Sixth Circuit Court of Appeals takes a "liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6)." *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001). For example, "[i]f referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings." *Id.* (citing *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999)). A court may also consider public records or materials for which judicial notice is appropriate without converting a motion to dismiss into one for summary judgment. *Id.*; *see also Grise v. Stewart Cty. Sch. Sys.*, No. 3:21-cv-00058, 2021 WL 4864490 (M.D. Tenn. 2021) (Richardson, J.) (noting that a court may consider public records that are referred to in the pleadings and are integral to the claims without converting the motion to dismiss into one for summary judgment).

Here, Plaintiff's Complaint repeatedly refers to the Chancery Court proceedings relating to the First (and Second) Tax Referendum Petitions. The filings in those cases are also public records of which the Court may take judicial notice. In fact, Plaintiff's Complaint references the ruling in DCEC's unsuccessful appeal of the trial court ruling on 4 Good Government's second petition. (Compl. ¶ 35 (citing *Metro. Gov't of Nashville & Davidson Cty. v. Davidson Cty. Election Comm'n*, No. M202100723COAR3CV, 2022 WL 880477 (Tenn. Ct. App. Mar. 25, 2022).) Accordingly, the Court may properly consider these Chancery Court proceedings in addressing the Metro Defendants' motion to dismiss.

DeLanis's Complaint in this case characterizes the Metropolitan Government's action in requesting an injunction on the First and Second Tax Referendum Petitions as an "Anti-Referendum Policy." (*Id.* ¶¶ 31, 33.) In addressing the merits of the First Tax Referendum Petition, however, Chancellor Ellen Hobbs Lyle ruled that:

> The clear and obvious ways that the Proposed Act violates Tennessee law authorize this Court to issue a pre-election declaratory judgment that the Davidson County Election Commission is not required to place the Proposed Act on the ballot nor conduct a referendum election, and that the Election Commission is enjoined from doing so.

(*See* Petition 1 Slip op. at 50, Mot. Ex. 1.) 4 Good Government did not appeal that ruling. Instead, in late 2020/early 2021, it initiated a second petition drive in an attempt to limit the Metropolitan Government's taxing authority. ("Second Tax Referendum Petition"). (Compl. ¶¶ 34-35.) When 4 Good Government filed the Second Tax Referendum Petition, DeLanis served as Chair of the DCEC. (*Id.* ¶ 20.)

Instead of requesting guidance from the court as it did with the First Tax Referendum Petition, on May 10, 2021, the DCEC voted to place the Second Tax Referendum Petition on the ballot. (*Id.* ¶ 39.) The following day, the Metropolitan Government filed a petition for writ of certiorari and writ of mandamus, which was docketed as Chancery Court Case No. 21-0433-IV. (*Id.* ¶ 41.)

In response to the Second Tax Referendum Petition, Councilmember Mendes filed, and the Metropolitan Council passed, Resolution RS2021-837 (the "Resolution"). The Resolution sought to amend the Metropolitan Charter to preserve the Metropolitan Government's taxing authority and addressed other subject matters at issue in the Second Tax Referendum Petition. (*Id.* ¶¶ 36-37; Resolution, attached to Motion as Exhibit 2.) By its terms, the Charter amendments proposed in the Resolution would be submitted to voters only if and when the Second Tax Referendum Petition's proposed amendments were submitted to voters. (Resolution, Mot. Ex. 2.)

On May 13, 2021, the DCEC met to discuss the Resolution. Councilmember Mendes addressed the DCEC at that meeting. The Complaint alleges that he "berated," "challenged," and "threatened" the DCEC. (Compl. ¶ 44.) Councilmember Mendes's comments at the public meeting, however—which emphasized the Resolution's unanimous support among Metropolitan Councilmembers and that DCEC's counsel did not advise the DCEC that the Resolution should be kept off the ballot[3]—speak for themselves.[4]

Thereafter, Councilmember Mendes inquired into the DCEC's ability to retain its own attorneys. (Compl. ¶ 47.) The Complaint posits that Councilmember Mendes intended to "discourage the DCEC and individual Commissioners from putting the Tax Referendum on the ballot and were made based on and in furtherance of the Metro Anti-Referendum Policy." (*Id.*) The content of the email reveals no such intention. The email amounts only to an inquiry to Jeff Roberts, Administrator of Elections, about whether the DCEC's privately-retained counsel should have handled public records requests instead of the Metropolitan Department of Law. (May 25, 2021, Email, attached to Motion as Exhibit 3.)

In addition to serving on the DCEC, DeLanis also worked at Baker Donelson, a law firm in Tennessee. (Compl. ¶¶ 4, 8.) According to the Complaint, after DeLanis was appointed to the DCEC, the Metropolitan Government became one of Baker Donelson's clients and remained a client during the relevant events underlying this case. (*Id.* ¶¶ 24-25.)

---

[3] The Court can view the meeting here: https://archive.org/details/mgntn-05_13_21_Davidson_County_Election_Commission (last visited Aug. 16, 2022). Councilmember Mendes spoke toward the end of the meeting, beginning at 2:06:31.

[4] In *Bell v. City of Southfield, Michigan*, 37 F.4th 362 (6th Cir. 2022), the Sixth Circuit reiterated that it may under certain circumstances consider evidence outside the four corners of a complaint when determining whether the complaint states a plausible claim for relief. *Id.* at 364. The Court noted that "it makes little sense to waste time and effort by ignoring [] videos' contents" where it easily resolves a case. *Id.* Moreover, where "indisputable video evidence contradicts [the plaintiff's] pleadings, his allegations are implausible." *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007).

According to DeLanis, "upon information and belief," "at some point prior to or on May 25, 2021," unidentified Metropolitan Government officials, with authority over the budget, finances, litigation, and Anti-Referendum Policy, contacted one or more unidentified principals at Baker Donelson to solicit their help in discouraging DeLanis from placing the Second Tax Referendum Petition on the ballot for a referendum election. (*Id.* ¶¶ 39, 48-49.) On May 25, 2021, John Hicks, Baker Donelson's de facto general counsel, requested to meet with DeLanis the following morning. (*Id.* ¶¶ 14, 50.) At the meeting, Hicks expressed frustration at DeLanis's position on the DCEC and represented that both the Metropolitan Government and the Metropolitan Nashville School Board were threatening to pull their business from Baker Donelson. (*Id.* ¶¶ 52-54.) Hicks also raised concerns about whether there was a conflict of interest between DeLanis's position on the DCEC and Baker Donelson's representation of the Metropolitan Government. (*Id.* ¶ 55.) The Complaint alleges that on May 28, 2021, Hicks told DeLanis that Hicks had determined there was no conflict and that Hicks would work it out with the firm's clients. (*Id.* ¶ 58.)

On June 22, 2021, Chancellor Russell Perkins ruled that the Second Tax Referendum Petition was defective, vacated the DCEC's decision to place the petition on the ballot, and enjoined the July 27, 2021, referendum election. (*Id.* ¶ 59; *see The Metro. Gov't of Nashville & Davidson Cty., Tenn. v. The Davidson Cty. Election Comm'n*, Case No. 21-0433-IV, Mem. & Final Order at 41 ("Petition 2 Slip op."), attached to Motion as Exhibit 4.)[5]

The Complaint next speculates "on information and belief" that the same unidentified Metropolitan Government officials, at the behest of Councilmember Mendes, contacted

---

[5] Chancellor Perkins issued a follow-up order on June 23, 2021, correcting some scrivener's errors in his original ruling. None of those corrections alter the final conclusion that the Second Tax Referendum Petition was defective and that the election should be enjoined. (June 23, 2021, Correction Order, Case No. 21-0433-III, attached to Motion as Exhibit 5.)

unidentified principals at Baker Donelson to aid in efforts to keep the DCEC from voting to appeal the Chancery Court's ruling on the Second Tax Referendum Petition. (Compl. ¶¶ 64, 65, 78, 79, 80.)

On June 24, 2021, Hicks asked DeLanis either to abstain from voting on whether to appeal the ruling or to vote against the appeal. (*Id.* ¶ 66.) The same day, Councilmember Mendes penned an open letter urging DCEC to accept the Chancery Court ruling and not to pursue an appeal. (*Id.* ¶¶ 68-76.)[6]

Between June 25 and 29, 2021, Baker Donelson management initiated conversations with DeLanis about his continued employment. (Compl. ¶¶ 81-87.) According to the Complaint, again based "on information and belief," Baker Donelson chose to terminate DeLanis's employment based on "the demands and requests made by Metro and Metro Officials on the firm which were made by it and its officials pursuant to the Metro Anti-Referendum Policy." (*Id.* ¶ 94.)

Plaintiff also asserts that the Metropolitan Government continues to pursue and enforce an "Anti-Referendum Policy." (*Id.* ¶ 97.) As support, he cites RS2022-1475, which the Metropolitan Council passed on May 5, 2022, and voters adopted on August 4, 2022.[7] (Compl. ¶ 97.) RS2022-1475 sets forth several proposed Charter amendments, including one that

---

[6] The Complaint contains selected excerpts from the letter. The full letter is attached to the Metro Defendants' Motion as Exhibit 6.

[7] The amendment proposed in RS2022-1475 addressing the Charter-amendment process appeared on the August 4 ballot as Charter Amendment No. 1. The text of Charter Amendment No. 1 can be found on pages 11-13 of the Sample Election Ballots that the DCEC issued, which are available at https://www.nashville.gov/sites/default/files/2022-07/Sample_Ballot_August_4_2022_pgs_1-20.pdf?ct=1657054919. On August 19, 2022, the DCEC certified the vote totals for Charter Amendment No. 1, with 39,864 voting for ratification and 23,049 against ratification, as noted here: https://www.nashville.gov/departments/elections/election-returns-and-statistics/election-returns/current-election.

Case 3:22-cv-00469   Document 18   Filed 08/22/22   Page 8 of 37 PageID #: 174

would modify the process for citizen-initiated petitions. From this, the Complaint extrapolates that any petition attempting to set the tax rate would be impermissible. (*Id.*)

## LEGAL STANDARD

The standard for testing the sufficiency of the allegations in a complaint in a motion to dismiss under Fed. R. Civ. P. 12(b)(6) was articulated by the United States Supreme Court in *Bell Atlantic Corp. v. Twombly*. 550 U.S. 544 (2007). A plaintiff must allege in a complaint "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. The "decision in *Twombly* expounded the pleading standard for 'all civil actions,'" including this one. *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009).

As the Supreme Court reiterated in *Iqbal*, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557) (cleaned up). Further, the tenet that a court must accept as true all of the well-pleaded factual allegations contained in a complaint is inapplicable to legal conclusions: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citations omitted). A court is not required to accept as true a "legal conclusion couched as a factual allegation." *Id.* (citations omitted). Determining whether a complaint states a claim for relief that is plausible on its face is a context-specific exercise that requires a court to "draw on its judicial experience and common sense." *Id.* at 679 (citations omitted).

## ARGUMENT

## I. THE OFFICIAL CAPACITY CLAIMS AGAINST COUNCILMEMBER MENDES SHOULD BE DISMISSED AS DUPLICATIVE OF THE CLAIMS AGAINST THE METROPOLITAN GOVERNMENT.

Courts consider official capacity claims against government officials as claims against the government itself. *Frost v. Hawkins Co. Bd. of Educ.*, 851 F.2d 822, 827 (6th Cir. 1988) ("[O]fficial capacity claims are essentially claims against the entity itself."). Thus, when a

plaintiff brings claims against a government official in his official capacity, in addition to the government, such claims are redundant and will be dismissed. *Johnson v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, No. 3:07-0979, 2008 WL 2066475, at *4 (M.D. Tenn. May 13, 2008) (dismissing official capacity claims against chief of police and police officers where the Metropolitan Government was also a named defendant) (Trauger, J.); *Kentucky v. Graham*, 473 U.S. 159, 167 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, *supra*, local government units can be sued directly for damages and injunctive or declaratory relief."); *Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 509 (6th Cir. 1996) (affirming dismissal of official capacity claims of various school board members and officials as duplicative of claims against the county).

DeLanis sues Councilmember Mendes individually and "in his capacity as a member of Metro Council" of the Metropolitan Government. (Compl. at 1.) For all three claims that Plaintiff asserts against Councilmember Mendes, he brings the same claims against the Metropolitan Government. (*Id.* at 19-26.) Thus, all claims against Councilmember Mendes in his official capacity should be dismissed as duplicative.

## II. COUNCILMEMBER MENDES IS ENTITLED TO ABSOLUTE IMMUNITY FOR HIS LEGISLATIVE ACTIONS.

Plaintiff claims that Councilmember Mendes participated in efforts to "oppose and discourage the DCEC and its Commissioners, who were state officials, from voting to appeal the June 21, 2021, trial court ruling" and that Mendes "proposed ballot issues . . . that would forever prohibit public referendum on certain tax issues . . . . " (*Id.* ¶ 107.) Mendes accomplished that objective by filing legislation and urging the DCEC to hold an election on the Resolution. The act of legislating and advocating for the Metropolitan Government's taxing authority fits squarely within Mendes's role as a Metro Councilmember and thus

within the sphere of a councilmember's legislative activities. Therefore, Councilmember Mendes is entitled to absolute immunity from claims that are based on his performance of legislative activities.

Legislators at all levels of government are entitled to absolute immunity from liability under Section 1983 for their "legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44 (1998); *see also Dunleavy v. Wayne Cty. Comm'n*, No. Civ.A.04CV74670DT, 2006 WL 891450, at *3 (E.D. Mich. Mar. 30, 2006) (applying legislative immunity to county commissioners); *4th Leaf, LLC v. City of Grayson*, 425 F. Supp. 3d 810, 823 (E.D. Ky. 2019) (applying legislative immunity to individual city council members). "Legislative immunity exists so that individuals can feel more comfortable volunteering to perform public-service functions . . . . Because 'the threat of liability may significantly deter service in local government, where prestige and pecuniary rewards may pale in comparison to the threat of civil liability,' legislative immunity continues to play an important role." *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 219 (6th Cir. 2011) (quoting *Bogan*, 523 U.S. at 52).

"The Supreme Court has instructed courts to interpret this grant of absolute immunity 'broadly to effectuate its purposes.'" *Kent v. Ohio House of Representatives Democratic Caucus*, 33 F.4th 359, 368 (6th Cir. 2022) (quoting *U.S. v. Johnson*, 383 U.S. 169, 180 (1966)). "Legislators enjoy absolute immunity if their actions fall within the sphere of legitimate legislative activity." *Pratt Land & Dev., LLC v. City of Chattanooga*, No. 1:19-CV-010, 2020 WL 5240750, at *4 (E.D. Tenn. Sept. 2, 2020) (citing *Bogan*, 523 U.S. at 54). "Matters are within the sphere of legislative activity when they are an 'integral part of the deliberative and communicative processes by which Members participate . . . .'" *Id.* (quoting *Gravel v. U.S.*, 408 U.S. 606, 625 (1972)). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *4th Leaf,*

*LLC*, 425 F. Supp. 3d at 823 (quoting *Bogan*, 523 U.S. at 49). "[A]n act [must be] both legislative in form and legislative in substance." *Id.* (citing *Guindon v. Twp. of Dundee*, 488 F. App'x 27, 33 (6th Cir. 2012)). To be legislative in form, an act must constitute an "integral step[ ] in the legislative process." *Id.* "An act is legislative in substance if it bears 'all the hallmarks of traditional legislation,' including 'a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents.'" *Id.* (internal quotations omitted).

Any claims arising out of the following allegations are entitled to legislative immunity:

- Councilmember Mendes's opposition to the First Tax Referendum Petition, along with "most members of the Metro Council" (Compl. ¶ 30);

- Councilmember Mendes filing Resolution 2021-837 and its two Amendments with the Metro Council (*id.* ¶¶ 36, 37);

- Councilmember Mendes's statements during a May 13, 2021, Commission meeting, which he made "as a Metro Councilman," challenging the independence of the DCEC and its authority (*id.* ¶ 44); and

- the Metropolitan Council's adoption of RS2022-1475 (*id.* ¶ 97).

Courts have previously granted legislators absolute immunity for these activities. In *Bogan*, "the Supreme Court found that legislative immunity protected officials who passed an ordinance . . . ." *4th Leaf, LLC*, 425 F. Supp. 3d at 823 (citing *Bogan*, 523 U.S. at 55-56). In *Pratt Land*, the court held that a city councilmember was acting in his legislative capacity when he introduced a resolution to the council. 2020 WL 5240750, at *5; *see also Ford v. Tenn. Senate*, No. 1:19-cv-010, 2007 WL 5659414, at *8 (W.D. Tenn. Aug. 15, 2007) (finding that the Senate's act of proposing and voting on a resolution was legislative in nature for the purposes of legislative immunity). In *Timmon v. Wood*, 633 F. Supp. 2d 453 (W.D. Mich. 2008), the court held that "[a] city council is acting in its legislative capacity when it exercises its investigatory power by presiding over a public-comment period." *Id.* at 460, *quoted in*

*Guindon*, 488 F. App'x at 35. Indeed, the Sixth Circuit has succinctly outlined the broad scope of legislative immunity, as follows:

> Legislators have been held immune from suit for a host of actions, including deciding to include private information in a report submitted to a congressional committee; revealing classified information while participating in legislative committees; and performing various other activities that are "clearly a part of the legislative process" including making a speech on the House floor, subpoenaing records for committee hearings, and voting for resolutions.

*Kent*, 33 F.4th at 368 (internal citations omitted).

Councilmember Mendes, acting in his role as a Metropolitan Councilmember, is entitled to enjoy the internal workings of the legislative process without interference from courts. This includes the ability to make comments at Commission or Council meetings, voice constituent concerns, propose resolutions, express concern publicly about matters that threaten the finances of the city he leads, and vote on resolutions. Councilmember Mendes is therefore immune from Section 1983 liability for the plainly legislative activities alleged in Paragraphs 30, 36, 37, 44, and 97 of the Complaint.

### III. PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIMS AGAINST THE METRO DEFENDANTS IN COUNT I SHOULD BE DISMISSED BECAUSE THE COMPLAINT CONTAINS NO WELL-PLEADED FACTS TO ESTABLISH THAT COUNCILMEMBER MENDES OR ANY OTHER METRO OFFICIAL TOOK AN ADVERSE ACTION AGAINST PLAINTIFF.

Plaintiff asserts in Count I of the Complaint that his rights to free speech and freedom of association were violated. (Compl. ¶ 102.) While the Complaint makes no effort to parse out the factual predicate for the freedom of association claim, courts analyze freedom of association and freedom of speech claims the same way. *Akers v. McGinnis*, 352 F.3d 1030, 1036 (6th Cir. 2003). Plaintiff's First Amendment claims center on his participation in a political process as a member and Chair of the DCEC and his purported right to hold an unlawful election at Metropolitan Government expense and to vote in favor of a costly appeal when the trial court canceled the election, all without any political pushback. But because no

Metropolitan Government official took any adverse action against Plaintiff, his First Amendment claims fail on the pleadings.

Under general First Amendment retaliation principles, "a plaintiff must plead factual allegations establishing that: (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2022).

### A.  The Context of Speech Matters When Determining Whether Actions Are Adverse for Retaliation Purposes.

"First Amendment law is particularly context-driven." *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999). The question of what is an "adverse action" depends on the context. *Id.* at 398. This element is not to be applied "mechanically," "as 'each step of the analysis is flexible enough to take into account the various contexts in which retaliation claims might be made." *Hornbeak-Denton v. Myers*, 361 F. App'x 684, 689 (6th Cir. 2010) (quoting *Thaddeus-X*, 175 F.3d at 395).

To illustrate, an individual can speak as a ***private citizen*** in a traditional public forum with limited interference from the government. *Thaddeus-X*, 175 F.3d at 389 (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). The government may restrict a ***public employee's*** speech when the individual speaks pursuant to his or her official duties or when the government's interests as an employer outweigh the employee's. *Garcetti v. Ceballos*, 547 U.S. 410 (2006) (holding that an employee who speaks pursuant to official duties is not entitled to First Amendment protection); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563 (1968) (setting forth the balancing test to determine whether a public employee's interest in speech outweighs the government's

interest in the efficiency of its operations).

As courts have held, however, "[m]any of the reasons for restrictions on employee speech appear to apply with much less force in the context of ***elected officials***." *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 178 (3d Cir. 2015) (granting qualified immunity where there was "no allegation here that the failure to reappoint Werkheiser as Roadmaster in any way excluded him from Town Supervisors' meetings, interfered with his rights, privileges, or responsibilities as an elected official, or hindered his ability to fulfill his elected duties") (emphasis added). While the Sixth Circuit has not addressed the question, many courts have held that "elected officials enjoy no First Amendment protection from retaliation for political speech unless that retaliation strips them of their office, or their fundamental ability to function in that office." *See, e.g.*, *King v. City of New York*, -- F. Supp. 3d --, 2022 WL 138009, at *6 (S.D.N.Y. 2022) (citing *Camacho v. Brandon*, 317 F.3d 153, 161-66 (2d Cir. 2003); *Velez v. Levy*, 401 F.3d 75, 97-101 (2d Cir. 2005)); *Werkheiser*, 780 F.3d at 181 ("[A]s other courts to consider the issue have concluded, the First Amendment may well prohibit retaliation against elected officials for speech pursuant to their official duties only when the retaliation interferes with their ability to adequately perform their elected duties.") (citing *Rash-Aldridge v. Ramirez*, 96 F.3d 117, 119 (5th Cir. 1996); *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 545 n.4 (9th Cir. 2010)); *see also Werkheiser v. Pocono Twp.*, 210 F. Supp. 3d 633, 641 (M.D. Pa. 2016) (rejecting retaliation claim because the actions at issue did not "interfere[ ] in any way with his right to hold his elected office").

## B. The Complaint Does Not Allege Conduct that Prohibited DeLanis, a State-Appointed Public Official, From Serving in His Public Role or Participating in the Political Process.

At all times relevant to this case, DeLanis spoke either as a State-appointed Commissioner or Chair of the DCEC. (Compl. ¶ 9; Tenn. Code Ann. § 2-12-101.) His position was public-facing. He was charged with significant duties and responsibilities, including

ensuring that elections are handled efficiently, fairly, and lawfully. He serves critically-important public interests. And his appointment was based on political affiliation.

Nothing about these facts suggests that the broad level of First Amendment protection that would apply to "private citizen" speech should apply here. Nor is DeLanis an employee of the Metropolitan Government such that the case should be evaluated under the "public employee" *Pickering* standard. He served in a State-appointed public official role.

The Sixth Circuit has explicitly recognized that "[p]ublic officials may need to have thicker skin than the ordinary citizen when it comes to attacks on their views." *Mattox v. City of Forest Park*, 183 F.3d 515, 522 (6th Cir. 1999). While DeLanis is free to serve in a political position and enjoy the fruit of that appointment, not every action that might constitute an adverse one for retaliation purposes in the *non*-political arena is deemed to be adverse in the political arena. Thus, this Court should apply the same standard that other courts apply to elected officials claiming retaliation in the context of their public roles—one that requires those officials to prove actual interference with their public duties. *See, e.g., King*, 2022 WL 138009, at *6; *Camacho*, 317 F.3d at 161-66; *Werkheiser*, 780 F.3d at 181; *Rash-Aldridge*, 96 F.3d at 119; *Blair*, 608 F.3d at 545 n.4.

Plaintiff has not alleged any infringement on his general right to serve as a public official or vote on public matters. He remains a member of the DCEC. He repeatedly spoke in favor of and voted for the Second Tax Referendum Petition to be placed on the ballot. He voted in favor of an appeal after the Chancery Court ruled for a second time that the 4 Good Government petition was defective and should not be put before voters. What DeLanis appears to allege is that his voice should be the only public voice and that any push-back is actionable in a federal court. DeLanis also appears to allege that he has a right to engage in public service in a manner that has a direct, significant negative impact on one of his private firm clients without that client expressing any concern about the matter. But what he has

not alleged is any actual impact on his ability to serve in his State-appointed public role. Thus, under the cases outlined above, no adverse action was taken against him.[8]

### C. DeLanis's Complaint Contains No Well-Pleaded Facts to Support His Conclusory Assertion that Unnamed Metro Officials Encouraged Baker Donelson to Take Action Against Him.

"To survive a motion to dismiss, a complaint must plead 'facts' that create a 'plausible inference' of wrongdoing." *In re Darvocet Products Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014) (citing *Iqbal*, 556 U.S. at 682). "The mere fact that someone believes something to be true does not create a plausible inference that it is true." *Id.* (citing *Twombly*, 550 U.S. at 551; *16630 Southfield Ltd. P'ship v. Flagstar Bank*, 727 F.3d 502, 506 (6th Cir. 2013)). The Sixth Circuit held in *16630 Southfield Limited* that by alleging facts "upon information and belief," a plaintiff has "merely alleged their 'belief,'" which fails to satisfy *Iqbal*. 727 F.3d at 506. That holding applies squarely to preclude DeLanis's innuendos about "Metro Officials" who, based "on information and belief," purportedly attempted to influence Baker Donelson.

Specifically, in six different numbered paragraphs, the Complaint speculates "on information and belief" that "officials with Metro who have authority over such matters as the Metro budget, Metro finances, Metro's position in the state court lawsuits, and the Metro

---

[8] In some jurisdictions, elected officials are deemed not to have First Amendment protection against retaliation from other elected officials where the speech at issue arises from the elected official plaintiff's elected role—akin to the defense available under *Garcetti v. Ceballos*, 547 U.S. at 418, when a public employee speaks as part of his or her job duties. *See, e.g.*, *Aquilina v. Wrigglesworth*, 298 F. Supp. 3d 1110, 1114-16 (W.D. Mich. 2018) (holding that "*Garcetti* removes Plaintiff's speech as a public official from the otherwise applicable protections against retaliation for speech"). The Sixth Circuit has not squarely addressed the issue, and the courts that have are not all in agreement. *See* discussion in *Werkheiser*, 780 F.3d at 180 (collecting cases). Regardless, undersigned counsel have identified only one Sixth Circuit case granting First Amendment protection to an elected official arising from the actions of another elected official, with the case providing protection only for a limited set of actions constituting "harassment," which included threats of bodily harm. *See Zilich v. Longo*, 34 F.3d 359, 363-64 (6th Cir. 1994).

Anti-Referendum Policy" pressured Baker Donelson to pressure DeLanis. (Compl. ¶¶ 48, 64, 78-80, 94.) These allegations are conclusory, not supported by any facts, and allege mere "belief." They do not identify any person or even position within the Metropolitan Government sufficient to establish that the individuals possessed the authority that DeLanis claims they have or possessed any power to influence Baker Donelson on any issue.

The Complaint in fact admits that DeLanis does not know which Metropolitan Government officials purportedly contacted Baker Donelson. (*Id.* ¶ 109.) He ventures a guess ("on information and belief") that it was Mayor John Cooper and Councilmember Mendes, but he provides no factual basis for this purported belief. (*Id.*) Because the allegations alluding to collusion between unidentified Metropolitan Government officials to have Baker Donelson take unspecified action against DeLanis lack any factual support to raise the assertions beyond a speculative level, they must be ignored.

**D.** **The Only Well-Pleaded Allegations for Which Councilmember Mendes Is Not Entitled to Absolute Immunity Do Not Constitute Adverse Actions.**

The only properly-pleaded actions that Councilmember Mendes allegedly took for which he does not have legislative immunity are not adverse for First Amendment purposes. Those remaining alleged actions include:

- Councilmember Mendes's May 25, 2021, Email, wherein he asked Jeff Roberts whether it was proper for the DCEC's private counsel, who was retained for the second lawsuit, to handle a public records request instead of the Metropolitan Department of Law. (Compl. ¶ 46; May 25, 2021, Email, Mot. Ex. 3.)

- Councilmember Mendes's June 24, 2021, Open Letter asking the DCEC not to the appeal the Chancery Court's June 21, 2021, ruling that the Second Tax Referendum Petition should not be placed on the ballot. (Compl. ¶ 68-73); (Mendes June 24, 2021, Open Letter, Mot. Ex. 6.)

First, the May 25, 2021, Email is not directed at DeLanis at all and bears no logical connection to him or any protected activity. It is merely an email seeking information about

an unusual situation that had arisen that was costing the Metropolitan Government money. No reasonable person, whether a State-appointed public official or otherwise, would construe the innocuous email as threatening or harassing. It is an email asking a question; nothing more and nothing less.

While the June 24, 2021, Open Letter contains pointed language about DeLanis, it is not an adverse action. The letter merely addressed the DCEC Commissioners and pleaded with them to save taxpayer dollars by voting not to appeal the Chancery Court's ruling that the Second Tax Referendum Petition was defective and should not be placed on the ballot. The First Amendment does not insulate any political official from opposing viewpoints or even "political bickering." *Mattox*, 183 F.3d at 522 ("While the political battle may have been more divisive, as a public official the plaintiff opened herself up to criticism of herself and her views."); *Zilich*, 34 F.3d at 363 ("The First Amendment is not an instrument designed to outlaw partisan voting or petty political bickering through the adoption of legislative resolutions."). The Open Letter was part of a political battle, at worst, and is not an adverse action.

In fact, to find that Councilmember Mendes retaliated under the First Amendment for expressing views on public, political issues would be to infringe on *his* First Amendment rights. The Supreme Court could not have been clearer on this point when discussing the "wide latitude" that legislators have to debate matters of public interest:

> The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy. The central commitment of the First Amendment, as summarized in the opinion of the Court in *New York Times v. Sullivan* is that "debate on public issues should be uninhibited, robust, and wide-open." We think the rationale of the New York Times case disposes of the claim that Bond's statements fell outside the range of constitutional protection. Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, *so statements criticizing public policy and the implementation of it must be similarly protected*. The State argues that the New York Times principle should not be extended to

statements by a legislator because the policy of encouraging free debate about governmental operations only applies to the citizencritic of his government. We find no support for this distinction in the New York Times case or in any other decision of this Court. ***The interest of the public in hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics than to legislators.*** Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them.

*Bond v. Floyd*, 385 U.S. 116, 135-37 (1966) (emphasis added). Councilmember Mendes is well within his rights as a local legislator to advocate against positions that the DCEC took, takes, or will take in the future, and such advocacy is not adverse to the DCEC or any of its members. The First Amendment does not insulate public officials from criticism of their opinions or actions—even harsh criticism—and Plaintiff's First Amendment claim against Councilmember Mendes fails to the extent it is based on such political criticism.

Notably, these very types of statements were recently deemed not to be adverse for First Amendment purposes in *Spencer v. City of Hendersonville*, 487 F. Supp. 3d 661 (M.D. Tenn. 2020) (Trauger, J.). In *Spencer*, a candidate for city alderman sued numerous city officials and the City of Hendersonville for First Amendment retaliation. There, the court examined myriad actions that city officials were alleged to have taken, concluding that none of them were sufficiently adverse to establish a retaliation claim. They included:

- making disparaging and defamatory statements about plaintiff on social media;
- accusing the plaintiff of pursuing a false narrative;
- portraying the plaintiff in a false light, causing him mental anguish, humiliation, and potentially damaging his reputation;
- attempting to intimidate the plaintiff in public meetings; and
- directing the local union to send plaintiff a letter threatening that he would be sued if he did not stop making public records requests and opposing the government.

*Id.* at 673, 688. Significantly, the Court held that these actions fell short of the First Amendment's requirements despite Plaintiff's allegation that some of them violated state

law, including the Hendersonville Municipal Code and Tenn. Code Ann. § 29-19-122, a different section of the same Tennessee Code Chapter that DeLanis alleges was violated here.

The Court should reach the same conclusion in this case as the Court reached in *Spencer*. There is nothing nefarious or improper about city officials, elected or otherwise, challenging decisions of the DCEC that undermine the Metropolitan Government's governmental authority or finances. That is all that Plaintiff has alleged in this case with any level of specificity, and those allegations fall short of "adverse" actions.[9]

It is also an illogical leap, devoid of any factual basis, to suggest that Councilmember Mendes's public advocacy and lobbying efforts targeted at the DCEC translated into clandestine requests to have DeLanis terminated—particularly when DeLanis confesses not to know who purportedly called for his removal. (Compl. ¶ 109.) To survive a motion to dismiss, there must be some factual support linking the facts that Plaintiff alleges— Councilmember Mendes's public, legislative actions; May 25, 2021, email asking about a public records request; and June 24, 2021, Open Letter—to some unspecified, nefarious effort to influence Baker Donelson. There is no such factual support. Plaintiff's vague, unspecified

---

[9] Even if not protected by absolute legislative immunity, Councilmember Mendes's actions taken publicly to dissuade the DCEC from placing the Second Tax Referendum Petition on the ballot and to appeal the Chancery Court's ruling reversing that decision also are not adverse under retaliation principles. As the cases discussed above establish, the First Amendment does not insulate a political official, such as DeLanis, from politicking and opposing viewpoints. *Mattox*, 183 F.3d at 522. All of the actions that Councilmember Mendes publicly took—speaking out at a public meeting, filing a resolution to place a countermeasure on the ballot, and sending an open letter—were not only reasonable steps to counter what he perceived to be a dangerous and illegal decision, but were consistent with *his* constitutionally-protected right to engage in political discourse. *See Zilich*, 34 F.3d at 363-64 ("Voting on legislative resolutions expressing political viewpoints may itself by protected political speech. Such resolutions are simply the expression of political opinion."); *see also Werkheiser*, 210 F. Supp. 3d at 640 ("After all, Plaintiff is not the only party in this case whose interests implicate the First Amendment . . . ."); *Blair*, 608 F.3d at 545 ("Third, it is significant that Blair isn't the only party in this case whose interests implicate First Amendment concerns. To the contrary, we assume *all* of the Board members have a protected interest in speaking out and voting their conscience on the important issues they confront.").

assertions about statements purportedly made by other unnamed Metropolitan Government officials fare no better. Accordingly, DeLanis's First Amendment claims against the Metro Defendants based on these actions should be dismissed.

## IV. PLAINTIFF'S PASSING REFERENCES TO "DUE PROCESS" AND "EQUAL PROTECTION" IN COUNT I FAIL TO PLEAD VIABLE CLAIMS AGAINST THE METRO DEFENDANTS.

Plaintiff's Complaint makes a singular passing reference to Due Process and Equal Protection violations in Count I, the same count alleging First Amendment retaliation claims against the Metro Defendants. (Compl. ¶ 106.) These passing references fail to state viable claims.

DeLanis alleges that he had a "right to due process" to serve on a commission and fulfill his oath of office to consider and vote on matters before the DCEC without "illegal or inappropriate influence that would be in violation of the Due Process and/or Equal Protection Clauses of the Fourteenth Amendment . . . . " (*Id.*) It is unclear whether DeLanis attempts to allege a procedural or substantive due process violation. Under either path, the Complaint fails to state a constitutional violation.

The Fourteenth Amendment provides in pertinent part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." The procedural component of the due process clause requires a deprivation of a fundamental right without procedure. To establish a procedural due process claim, a plaintiff must allege that: "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof's Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). The "substantive component of the due process clause protects those rights that are 'fundamental.'" *Palko v. State of Conn.*, 302 U.S. 319, 325 (1937) (emphasis added), *overruled on other grounds*, *Benton v. Maryland*, 395 U.S. 784, 793-94

(1969).

Substantive due process claims are not available to vindicate enumerated constitutional rights: "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (quotation marks omitted). Citing *Albright*, the Sixth Circuit reiterated this principle in the context of a First Amendment speech case in *Thaddeus-X v. Blatter*, rejecting the argument that a prisoner's retaliation claim was subject to the "shocks the conscience" standard. 175 F.3d at 387-88. As the Sixth Circuit recognized, where the First Amendment "properly covers" a retaliation claim, the court should "turn to that framework for guidance.'" *Id.* at 388.

Plaintiff's lawsuit is grounded in his rights to freedom of speech and association. His passing reference to a due process violation, *within* the Count of his Complaint that alleges First Amendment retaliation, relates to those rights. Thus, the proper vehicle to vindicate those rights is a Section 1983 claim for First Amendment retaliation, which DeLanis brings here. Nor does Plaintiff identify any other source of a proper substantive due process claim. Accordingly, insofar as Plaintiff attempts to allege a substantive due process claim, it should be dismissed.

Likewise, Plaintiff alleges no cognizable property interest of which he was deprived to establish a procedural due process claim. "Public office is not property within the meaning of the Fourteenth Amendment." *Burks v. Perk*, 470 F.2d 163, 165 (6th Cir. 1972), *cert. denied*, 412 U.S. 905 (1973) (citing *Taylor & Marshall v. Beckham*, 178 U.S. 548 (1900)); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 578 (1972) (holding that assistant professor

at public institution had no property interest in nontenured position); *Abeyta v. Town of Taos*, 499 F.2d 323, 327 (10th Cir. 1974) ("In this regard, public office or employment generally is held not to be a property interest within the meaning of the Fourteenth Amendment.").

Additionally, "[t]he two 'fundamental elements of procedural due process are notice and an opportunity to be heard.'" *Ozburn-Hessey Logistics, LLC v. NLRB*, 939 F.3d 777, 784 (6th Cir. 2019) (quoting *Henry Bierce Co. v. NLRB*, 23 F.3d 1101, 1106 (6th Cir. 1994) (citation omitted)). Plaintiff does not allege *any* actual deprivation of process, much less the specific process that he contends he was owed. He was appointed to the DCEC, served on the DCEC, attended meetings, presided over meetings as Chair, and cast votes. (Compl. ¶¶ 9, 19-20, 32, 44, 62, 96.) Simply stated, he has not alleged any process that he was owed but not provided, nor has he alleged a protected property interest in the first instance. Accordingly, his attempt to plead a procedural due process claim fails, and any such claim should be dismissed.

The Complaint's reference to equal protection within the First Amendment retaliation count likewise fails to state a viable claim. (*Id.* ¶ 106.) DeLanis does not allege that he is a member of a suspect class, which is the hallmark of a traditional equal protection claim, nor does he allege "that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). An equal protection plaintiff must show that he was treated differently from at least one similarly situated individual, and "[t]o satisfy this threshold inquiry, it must allege that it and other individuals who were treated differently were similarly situated in all material respects." *Taylor Acquisitions, LLC v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009) (citing *TriHealth, Inc. v. Bd. of Comm'rs of Hamilton Cty., Ohio*, 430 F.3d 783, 790 (6th Cir. 2005)).

Plaintiff's Complaint contains no well-pleaded factual allegations to suggest that he was treated less favorably than any other similarly situated individual(s). He mentions equal protection only in passing, falling far short of the requirement to plead a plausible claim under *Twombly*. Accordingly, insofar as Plaintiff attempts to plead an equal protection claim, it should be dismissed, as well.

**V.** **PLAINTIFF'S CLAIM IN COUNT II FAILS AS TO BOTH METRO DEFENDANTS BECAUSE STATE LAW VIOLATIONS MAY NOT BE ASSERTED THROUGH SECTION 1983, AND THERE IS NO PRIVATE RIGHT OF ACTION UNDER TENN. CODE ANN. § 2-19-202.**

As with Count I, the title of Count II of Plaintiff's Complaint identifies the First and Fourteenth Amendments and Section 1983 as the purported sources of the claim. (Compl. at 21.) Count I also references "VIOLATION OF STATE LAW," citing Tennessee Code Annotated § 2-19-202 as the purported source. (Compl. at 21.) Then, the first paragraph of Count II states, "Tennessee Code Annotated § 2-19-202 makes it unlawful for one public official to use their office to attempt to intimidate, coerce or command another public official to vote for or against any measure." (Compl. ¶ 113.) Insofar as Plaintiff attempts to plead a violation of Tenn. Code Ann. § 2-19-202, known as the "Little Hatch Act," the claim fails for two reasons.

First, "Section 1983 authorizes the courts to redress violations of 'rights, privileges, or immunities secured by the Constitution and [federal] laws' that occur under color of state law. The statute is thus limited to deprivations of federal statutory and constitutional rights. *It does not cover official conduct that allegedly violates state law*." *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989) (emphasis added).

Second, there is no private right of action under Tenn. Code Ann. § 2-19-202. Rather, the Little Hatch Act "provides for only a criminal penalty." *State ex rel. Deselm v. Tennessee Peace Officers Standards Comm'n*, No. M200701855COAR3CV, 2008 WL 4614523, at *3 (Tenn. Ct. App. Oct. 16, 2008). "Violations of the Act are a misdemeanor, and there is no

provision in the Act for a private right of action." *Id.*

Because Section 1983 is not a mechanism for asserting state law violations, and the Little Hatch Act does not establish a private right of action, Count II of the Complaint should be dismissed.

**VI.  THE COURT SHOULD DISMISS THE COMPLAINT'S SECTION 1983 CONSPIRACY CLAIMS AGAINST THE METRO DEFENDANTS BECAUSE PLAINTIFF HAS NOT PLEADED A VIABLE CONSTITUTIONAL CLAIM.**

Plaintiff alleges that the Metro Defendants and Baker Donelson conspired to infringe on his constitutional rights. (Compl. ¶ 109.) "But a Section 1983 civil conspiracy by itself does not constitute a separate cause of action." *Kuilan v. Zimmerman*, No. 1:22-CV-00010, 2022 WL 1008856, at *4 (M.D. Tenn. Apr. 4, 2022) (Campbell, J.). Instead, "[a] claim for civil conspiracy under § 1983 exists only where the plaintiff has established a separate and actionable constitutional injury." *Id.* (quoting *Rapp v. Dutcher*, 557 F. App'x 444, 450 (6th Cir. 2014)); *see also Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir. 2009) ("[Plaintiff] cannot succeed on a conspiracy claim because there was no underlying constitutional violation that injured her."). Thus, where the underlying constitutional claims are subject to dismissal, a conspiracy claim fails as well. *Id.*

As described above, Plaintiff fails to allege a constitutional injury against the Metro Defendants. Thus, the Court should dismiss Plaintiff's civil conspiracy claims as well.

**VII.  COUNCILMEMBER MENDES IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S CONSTITUTIONAL CLAIMS AGAINST HIM.**

As outlined above, Plaintiff has not pleaded viable constitutional claims against Councilmember Mendes for First Amendment, Due Process, or Equal Protection violations. But even if the Court were to conclude that constitutional violations occurred, there is no clearly-established law that would have put Councilmember Mendes on notice that his specific actions in this case were unlawful at the time of the conduct. Accordingly,

Councilmember Mendes should be granted qualified immunity.

"Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Caudill v. Hollan*, 431 F.3d 900, 911 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Where, as here, a government official raises qualified immunity as a defense, *Plaintiff* bears the burden of "prov[ing] two factors to show that [the] government official is not entitled to qualified immunity from his suit: (1) that the facts as alleged by him show a violation of a constitutional right; and (2) that such violated right was clearly established." *LeMarbe v. Wisneski*, 266 F.3d 429, 434 (6th Cir. 2001); *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006).

In the qualified immunity analysis, the "[r]ights at issue must be clearly established, not just in the abstract sense, but in a particularized sense." *Caudill*, 431 F.3d at 912 (citing *Brosseau v. Haugen*, 543 U.S. 194 (2004)). The Supreme Court has noted that, although qualified immunity "do[es] not require a case on directly on point, [ ] existing precedent must have placed the statutory or constitutional question *beyond debate*." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (emphasis added).

The Supreme Court also has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. The "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brousseau*, 543 U.S. at 198 (2004) (quoting *Saucier*, 533 U.S. at 201).

There is no clearly established law that would have put Councilmember Mendes on

notice that the actions he is alleged to have taken in this case violated Plaintiff's First Amendment rights. As the Sixth Circuit recognizes, the context in which a First Amendment claim arises matters. *Thaddeus-X*, 175 F.3d at 388, 398. And there are no cases that would have informed Councilmember Mendes that any of the actions actually alleged (as opposed to the speculative "on information and belief" allegations) constitute an adverse action against a State-appointed public official when taken by an elected city councilmember, another public official.

"Public officials may need to have thicker skin than the ordinary citizen when it comes to attacks on their views," and not every "bitter" or "divisive" "political battle" is "constitutionally actionable." *Mattox*, 183 F.3d at 522. While *Zilich* acknowledges that certain forms of harassment or vindictive conduct, such as threatening physical violence, vandalizing, and making harassing phone calls, may constitute adverse action, 34 F.3d at 364, there are no controlling cases that would have put Councilmember Mendes on notice that his actions were adverse under the First Amendment. In fact, *Spencer v. City of Hendersonville*, though not controlling here for "clearly-established law" purposes,[10] strongly suggests otherwise. 487 F. Supp. 3d at 673, 688. Because there is no clearly-established law to support a finding of First Amendment retaliation under the specific circumstances of this case, Councilmember Mendes is entitled to qualified immunity on that claim.

Any assertion that Councilmember Mendes is not entitled to qualified immunity on Plaintiff's attempted Due Process, Equal Protection, or Little Hatch Act claims through Section 1983 would be even more specious. As outlined above, Plaintiff's Complaint does not

---

[10] *See Smith v. City of Troy, Ohio*, 874 F.3d 938, 944 (6th Cir. 2017) ("In making this [clearly-established law] determination, the court must rely on decisions from the United States Supreme Court, the Sixth Circuit Court of Appeals, or finally, the decisions of other circuit courts.").

allege facts to support such claims at even the most basic level. Nor can Plaintiff identify any cases that would have established violations of those provisions under similar circumstances. Accordingly, the Court should grant Councilmember Mendes qualified immunity on these remaining claims as well.

## VIII. PLAINTIFF HAS NOT ALLEGED A VIABLE CLAIM FOR SECTION 1983 MUNICIPAL LIABILITY AGAINST THE METROPOLITAN GOVERNMENT.

### A. There Is No Vicarious Liability Under Section 1983.

Section 1983, the statute under which all of Plaintiff's claims against the Metropolitan Government proceed, "does not permit a municipal entity to incur liability under a theory of *respondeat superior.*" *Miller v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Instead, a municipality can be liable under Section 1983 only by establishing (1) harm caused by a constitutional violation; and (2) municipal responsibility for the violation. *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). Under prong one, "a municipality cannot be held liable under § 1983 'based on the actions of one of its [officials] when in fact . . . the [official] inflicted no constitutional harm." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 449 (6th Cir. 2011) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). For prong two, "municipalities are liable for harms resulting from a constitutional violation *only* when the injury resulted from an 'implementation of [the municipality's] official policies or established customs.'" *Spears*, 589 F.3d at 256 (quoting *Monell*, 436 U.S. at 708 (Powell, J., concurring)).

Plaintiff's claim fails on both prongs.

### B. The Metropolitan Government Cannot Be Held Liable, As Here, in the Absence of a Constitutional Violation.

The Complaint does not allege a constitutional violation at the hands of any agent of the Metropolitan Government, as outlined in Sections III, IV, and VI above. Because the

Metropolitan Government cannot be held liable for a constitutional violation that never occurred, it should be dismissed from this action. *Lee*, 432 F. App'x at 449.

## C. Plaintiff's Complaint Does Not Allege Facts to Support an Unconstitutional Policy or Policymaker Theory of Liability.

The Complaint does not allege conduct sufficient to establish liability under prong two of the municipal liability analysis. A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority took or ratified illegal actions; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013); *Spears*, 589 F.3d at 256. Plaintiff's Complaint does not satisfy this standard.

Plaintiff does not identify the theory on which he seeks to fasten Section 1983 liability on the Metropolitan Government. The Complaint contains only one paragraph of properly-pleaded allegations even arguably relevant to the question:

> 107. Metro acting through its public officials and Mendes had implemented the Metro Anti-Referendum Policy to oppose the efforts to place the Tax Referendum on the ballot which policy included efforts by Metro to oppose and discourage the Commission and its Commissioners, who were state officials, from voting to appeal the June 21, 2021, trial court ruling and which policy also included proposed ballot issues written by Mendes and enacted by the Metro Council that would forever prohibit public referendum on certain tax issues unless authorized by state law.

(Compl. ¶ 107.)

Though the Complaint does not state as much, Plaintiff may be attempting to travel under the first theory of municipal liability: that the Metropolitan Government has an unconstitutional policy that caused constitutional violations. *Burgess*, 735 F.3d at 478. On

that theory, Plaintiff bears the burden of showing "that [an] unconstitutional policy or custom existed, that the policy or custom was connected to the [municipality], and that the policy or custom caused [the] constitutional violation." *Napier v. Madison Cty.,* 238 F.3d 739, 743 (6th Cir. 2001).

### 1. The Complaint's Purported "Anti-Referendum Policy" Is Not Unconstitutional.

Here, the only policy that Plaintiff's Complaint references is an "Anti-Referendum Policy," which Plaintiff contends the Metropolitan Government pursued and enforced in connection with the First and Second Tax Referendum Petitions.[11] But a governmental policy of opposing unlawful referendum petitions and advocating for the local legislative body to maintain authority to set tax rates constitutes sound fiscal policy, not an unconstitutional one. The Supreme Court recently reaffirmed that the First Amendment does not prohibit the government from expressing its own views or from declining to promote views that are contrary to its own. *Shurtleff v. City of Bos., Mass.*, 142 S. Ct. 1583, 1589 (2022). Indeed, "[t]hat must be true for government to work. Boston could not easily congratulate the Red Sox on a victory were the city powerless to decline to simultaneously transmit the views of disappointed Yankees fans. The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Id.*

When the government speaks on policy issues that affect its governance, it is not infringing on the First Amendment rights of those opposed to the government's view. *See Kidwell v. City of Union*, 462 F.3d 620, 625-26 (6th Cir. 2006) (holding that the government

---

[11] The Metro Defendants certainly refute the existence of any such policy. But even accepting Plaintiff's position that such a policy exists, Plaintiff fails to allege facts sufficient to support *Monell* liability here, as described herein.

did not unconstitutionally subsidize speech when it used public funds to campaign against various referendums that related to emergency services and tax initiatives and directly affected the government). That the DCEC voted contrary to the purported "Anti-Referendum Policy" does not render the policy unconstitutional. Again, the First Amendment rightfully provides space for robust political dialogue. *Mattox*, 183 F.3d at 522 ("While the political battle may have been more divisive, as a public official the plaintiff opened herself up to criticism of herself and her views."); *Zilich*, 34 F.3d at 363 ("The First Amendment is not an instrument designed to outlaw partisan voting or petty political bickering through the adoption of legislative resolutions."). It is perfectly reasonable and constitutional for municipal officials to advocate publicly for positions that affect the governance, sovereignty, and fiscal capacity of the government they serve.

Both the First and Second Tax Referendum Petitions attempted to place severe limitations on the Metropolitan Government's ability to govern itself and its finances. (Compl. ¶¶ 28, 31, 34-35.) Nothing in the Constitution requires Metropolitan Government officials to sit idly by while petitioners threaten the city's fiscal capacity. To find that the Metropolitan Government's policy of supporting its own interests is unconstitutional simply because a bare majority of the DCEC wanted the opposite policy would be to effectively silence the Metropolitan Government on matters in which it has both a vested interest and extensive expertise.

A First Amendment violation is simply not the logical consequence of a governmental policy that 1) seeks to protects a government's right to set its own tax rate in compliance with State law and 2) objects to spending hundreds of thousands of dollars on unnecessary and illegal elections. In fact, the irony of Plaintiff's argument leaps off the page: he essentially claims absolute First Amendment protection of his own right to participate in political processes while attempting to silence the very opposition that stands to suffer from the

political act at issue—voting to remove a local legislative body's taxing authority in violation of State law. (*See* Petition 1 Slip Op. at 45, 50, Mot. Ex. 1 ("In the analysis above, the Court has determined that all of the provisions of the Proposed Act are defective in form and/or are facially unconstitutional. . . . The clear and obvious ways that the Proposed Act violates Tennessee law authorize this Court to issue a pre-election declaratory judgment that the Davidson County Election Commission is not required to place the Proposed Act on the ballot nor conduct a referendum election, and the Election Commission is enjoined from doing so."); Petition 2 Slip Op. at 40-41, Mot. Ex. 4 ("The Court agrees with the Metropolitan Government that the "Limit Property Tax Rates" Amendment and the "Protect Promises to Nashville" provision are defective in form and unconstitutional in form under *City of Memphis* and *4GG-I*. . . . Given that the six Proposed Amendments are not severable, none of 4 Good Government's proposed Amendments to the Metropolitan Government's Charter are permitted to be considered for referendum election on July 27, 2021."). Nothing about Metropolitan Government officials adopting or acting pursuant to a policy that maintains the local legislative body's authority to set tax rates for purposes of generating revenue sufficient to cover expenses is unconstitutional: it is sound fiscal policy.[12]

Accordingly, insofar as Plaintiff attempts to fasten *Monell* liability based on an unconstitutional policy, the *Monell* claim fails.

---

[12] The Metropolitan Charter amendment that voters adopted on August 4, 2022, which Plaintiff references in his Complaint, is likewise constitutional, and Plaintiff does not have standing to challenge it. (Compl. ¶¶ 97-98.) There are no facts in the Complaint to suggest that Plaintiff is injured by the amended Charter provision in a manner that is distinct from the general public. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 & n.1 (1992) (requiring a plaintiff to "have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized"). That is, even if Plaintiff is correct that amending the Metropolitan Charter by referendum is harder now than before, that does not render the provision unconstitutional, nor does it injure Plaintiff "in a personal and individual way" that is distinct from the provision's impact on any other citizen. *Id.* at 560 n.1.

"Municipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality." *Miller*, 408 F.3d at 813 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986) (distinguishing between "decisionmaking" and "policymaking"). The U.S. Supreme Court has stated that "[a]uthority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." *Pembaur*, 475 U.S. at 483. In addition, whether a given individual has this "final policymaking authority is a question of state law." *Id.* "Although it is true that final policymaking authority may be delegated, it is equally true that 'mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials.'" *Miller*, 408 F.3d at 814 (citing *Pembaur*, 475 U.S. at 483; quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)).

To the extent that Plaintiff attempts to plead a claim for municipal liability under *Pembaur*'s "final decisionmaker" theory, the Complaint fails to do so. On this point, Plaintiff's Complaint adopts a kitchen sink approach, alleging the following:

> 109.    Metro acting through its public officials, who are presently unknown to DeLanis but who, on information and belief include Mayor John Cooper, and/or Mendes, violated his rights by attempting to intimidate or coerce him, by publicly threatening Commission members and/or by placing his private employment at risk, in order to cause him to either vote against efforts to place the public referendum on the ballot or to take other action to increase the probability that the Commission would not vote to appeal the June 21, 2021 trial court decision.

(Compl. ¶ 109.)

As described in Section III above, these speculative allegations, based "on information and belief" do not satisfy basic pleading standards. Judge Trauger's decision in *Spencer v. City of Hendersonville* is instructive on this point, as the Sixth Circuit affirmed her rejection of the plaintiff's retaliation claim, in part, on grounds that the "upon information and belief" allegations did not satisfy federal pleading standards. *Spencer*, 2021 WL 8016828, at *6.

Without identifying the individuals who purportedly spoke with Baker Donelson beyond a speculative "information and belief," Paragraph 109 of Plaintiff's Complaint constitutes nothing more than a conclusory allegation without any factual foundation. Plaintiff certainly has not pleaded facts sufficient to establish that these yet-to-be-named Metropolitan Government officials are policymakers sufficient to bind the government under state law for purposes of Section 1983 liability.

Beyond this plain deficiency in pleading, Plaintiff has not alleged any facts to establish municipal liability under this theory in any event. With all respect to the difficult and vital work that our local legislators do, one Councilmember does not make final policy all on his own. Nor has Plaintiff alleged that any Metropolitan Government official with final policymaking authority relevant to the facts of this case took any action against him, much less adverse action.

In ruling that the plaintiff had not alleged an adverse action attributable to the city sufficient to establish a *Monell* violation, again, *Spencer v. City of Hendersonville* is illustrative:

> The court finds that the statements by Cunningham, Bush, and other unidentified City officials were not sufficiently "adverse" to give rise to a retaliation claim, even assuming they could be attributed to the City. As set forth above, whether defamatory statements can be deemed adverse conduct for purposes of a retaliation claim depends on the context. Here, the plaintiff had run for political office and was engaged in a dispute with the City, asserting that City officials had behaved improperly and had inadequately investigated his claims that they had behaved improperly. It was entirely predictable that City officials would respond to his public allegations by

publicly refuting them. This was a matter of public interest. Even if the court accepts at this juncture that the verbal and social media responses, as alleged by the plaintiff, may have given rise to defamation claims under state law, they were not sufficiently adverse to give rise to a First Amendment retaliation claim. ***And Bush's verbal assertion that he would no longer respond to public records requests was simply a threat. Spencer does not allege that Bush actually had the authority to carry it out or that Spencer was harmed by the City's refusal to respond to any public records requests.***

Even considered in the aggregate, the court finds that, given the politically heated context, the allegedly defamatory, derogatory, and threatening statements were not sufficiently adverse to give rise to a viable claim for retaliation in violation of the First Amendment against the City.

487 F. Supp. 3d 661, 690–91 (M.D. Tenn. 2020) (emphasis added), *aff'd sub nom.*, *Spencer v. City of Hendersonville, Tenn.*, No. 20-6168, 2021 WL 8016828 (6th Cir. Oct. 8, 2021).

The same is true here. Plaintiff has not alleged facts to support a viable claim under a *Pembaur* theory, or any theory of municipal liability. Accordingly, all claims against the Metropolitan Government should be dismissed.

## CONCLUSION

Plaintiff's claims against the Metro Defendants should be dismissed in their entirety. Councilmember Mendes is entitled to absolute and qualified immunity because his actions were almost exclusively legislative and did not violate any of Plaintiff's clearly-established constitutional rights. The Metropolitan Government should be dismissed because the Complaint contains no well-pleaded facts to establish a constitutional violation at the hands of a government official, much less one with final policymaker authority, or an unconstitutional government policy. Nor has Plaintiff alleged a viable Equal Protection or Due Process claim against the Metro Defendants with a mere passing reference in Count I. Plaintiff's attempt at a state-law claim in Count II also fails because Section 1983 may not be used to vindicate such rights, nor does Plaintiff have a private right of action. Because Plaintiff's underlying constitutional claims fail, his civil conspiracy claims in Count III

necessarily fail as well. Accordingly, the Metro Defendants respectfully request that the Court dismiss all claims against them.

Respectfully submitted,

THE DEPARTMENT OF LAW
OF THE METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY

WALLACE W. DIETZ (#9949)
DIRECTOR OF LAW

/s/ Allison L. Bussell
ALLISON L. BUSSELL (#23538)
  ASSOCIATE DIRECTOR OF LAW
MELISSA S. ROBERGE (#26230)
MALLORY S. RICCI (#32492)
  SENIOR COUNSEL
108 Metropolitan Courthouse
P.O. Box 196300
Nashville, Tennessee 37219
(615) 862-6341
allison.bussell@nashville.gov
melissa.roberge@nashville.gov
mallory.ricci@nashville.gov

*Counsel for Defendants Metropolitan Government and Councilmember Bob Mendes*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing has been served via CM/ECF to:

| | |
|---|---|
| John I. Harris III<br>Schulman, LeRoy & Bennett PC<br>3310 West End Avenue, Suite 460<br>Nashville, TN 37203 | Robert E. Boston<br>Waller Lansden Dortch & Davis, LLP<br>511 Union Street, Suite 2700<br>Nashville, TN 37219 |

on this 22nd day of August, 2022.

/s/ Allison L. Bussell
Allison L. Bussell