IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JAMES A. DELANIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:22-cv-00469 |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| METROPOLITAN GOVERNMENT | ) | |
| OF NASHVILLE AND DAVIDSON | ) | |
| COUNTY, et al., | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM OPINION

Pending before the Court is the joint motion of Defendant Metropolitan Government of Nashville and Davidson County ("Metro") and Defendant Robert J. Mendes ("Mendes") (collectively, "Metro Defendants") to dismiss the amended complaint in part under Federal Rule of Civil Procedure 12(b)(6).[1] (Doc. No. 39). The motion is accompanied by a supporting memorandum. (Doc. No. 40). Plaintiff filed a response (Doc. No. 47), and Metro Defendants filed a reply (Doc. No. 53).

Defendant Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. ("Baker") also has filed a motion to dismiss the amended complaint in part pursuant to Rule 12(b)(6), and this motion is likewise accompanied by a supporting memorandum.[2] (Doc. Nos. 43, 44). Baker's motion to

---

[1] Metro Defendants moved to dismiss all counts in the amended complaint as pled against them but appropriately do not move to dismiss the counts pled solely against Baker. The Court therefore treats Metro Defendants' motion to dismiss as requesting dismissal of the amended complaint only in part.

[2] Although Baker's motion ostensibly suggests that it seeks dismissal of the amended complaint in its entirety, the motion does not address Count V (retaliatory discharge in violation of Tennessee Code Annotated § 50-1-304 alleged against Baker) or Count VI (injurious falsehood and interference with business opportunity alleged against Baker). The Court therefore treats the motion as a motion to dismiss the amended complaint in part.

dismiss adopts and incorporates the arguments set forth in Metro Defendants' motion to dismiss (Doc. No. 44), and it additionally asserts that Baker is entitled to qualified immunity. (*Id.*). Plaintiff filed a response (Doc. No. 48), and Baker filed a reply (Doc. No. 56).

For the reasons set forth below, Metro Defendants' motion to dismiss at Doc. No. 39 will be granted in part and denied in part, and Baker's motion to dismiss at Doc. No. 43 will be granted in part and denied in part.

<u>FACTS[3] AND PROCEDURAL HISTORY</u>

As the below (alleged) facts reflect, this case is about the alleged abuse of power intended to unlawfully influence the vote of an appointed state official.

**1. THE PARTIES[4]**

During the relevant time periods, Plaintiff was employed as an attorney by Baker, a national law firm with an office in Nashville, Tennessee. (Doc. No. 34 at 3). During these time periods, Plaintiff was a member, and the Chair, of the Davidson County (Tennessee) Election Commission ("Commission"). (*Id.* at 3-5). Pursuant to Tennessee Code Annotated § 2-12-101, the Commission comprises five members, each of whom is appointed by the State of Tennessee Election Commission. (*Id.* at 5). Commission members are state (not local) officials, with duties set forth by Tennessee law related to the administration of elections in Davidson County, Tennessee. (*Id.* at 4).

---

[3] Because the instant motion seeks dismissal under Federal Rule of Civil Procedure 12(b)(6), the Court takes the facts alleged in the amended complaint (Doc. No. 34) as true. For the reasons discussed further below, this applies even to facts alleged based on "information and belief." At times (but not always) herein, the Court refers to these facts as (merely) alleged, as occasional reminders to the reader that the Court is not pronouncing these facts as the established facts.

[4] The amended complaint uses the present tense to state many of these facts (in particular the ones about various public officials and offices at issue), but when it does so the clear implication is that these facts were also true in the past, in particular at the time of the events alleged in the amended complaint.

During the relevant time periods, Metro—a municipality organized under Tennessee state law—was a client of Baker. (*Id.* at 6). And during the relevant times periods, Metro's chief executive officer was its mayor, who was John Cooper, and its chief legislative body was the Metro Council. And finally, Mendes was a member of the Metro Council during the relevant time periods.

## 2. ADOPTION OF THE 34-PERCENT PROPERTY TAX INCREASE AND THE FIRST TAX REFERENDUM

On June 12, 2020, the Council for the Metropolitan Government of Nashville and Davidson County ("Metro Council") adopted a 34-percent property tax increase ("Tax Increase"). (Doc. No. 34 at 6). Mendes proposed the budget in which the Tax Increase was included. (*Id.*). Following the adoption of the Tax Increase, a group of citizens in Davidson County proposed a referendum ("First Tax Referendum") to limit the authority of the Metro Council to raise taxes by more than 5 percent without voter approval. (*Id.* at 7). The Commission had the duty of determining whether the First Tax Referendum met the legal requirements to be placed on the ballot for a public vote. (*Id.*). Given that the First Tax Referendum would have limited Metro Council's authority to increase the property tax by 34 percent, Metro Council was fervently opposed to the First Tax Referendum.[5] (*Id.*).

In early October of 2020, the Commission filed an action in the Chancery Court of Davidson County requesting a declaratory judgment as to whether the First Tax Referendum should be placed on the ballot for public vote. (*Id.* at 7–8). The Chancery Court then ruled that the First Tax Referendum should not be placed on the ballot. (*Id.* at 8). Upon receiving this ruling, a group of citizens began a campaign to have a second referendum placed on the ballot ("Second

---

[5] It is not clear from the amended complaint why the First Tax Referendum would have a retroactive effect on the 34-percent tax increase. Nonetheless, this ambiguity is not material to the Court's analysis on the instant motions.

Tax Referendum")—this time attempting to avoid the problems identified by the Chancery Court in its ruling regarding the First Tax Referendum. (*Id.*).

### 3. SECOND TAX REFERENDUM, AND JOHN HICKS'S MAY 25, 2021, EMAIL TO PLAINTIFF

On March 26, 2021, several months after the Chancery Court issued its ruling on the First Tax Referendum, Mendes filed Resolution 2021-837 ("Resolution") in his capacity as a Metro Council member. (*Id.* at 8–9). The Resolution stated that additional amendments to the Charter of the Metropolitan Government of Nashville and Davidson County, Tennessee would be placed on the ballot *if* (and only if) the Second Tax Referendum were to be placed on the ballot. (*Id.*). The potential charter amendments described in the Resolution, were they to be placed on the ballot and adopted, would serve to ban public referendums on property tax levies. (*See id.* at 9). The adoption of any such charter amendments would stymie the efforts of citizens to vote on a referendum regarding Metro Council's authority to raise taxes.[6] Soon after Mendes proposed the Resolution, the Commission voted to place the Second Tax Referendum on the ballot.[7] (*Id.* at 10).

On May 13, 2021, the Commission held a public meeting on the Second Tax Referendum (then set to go to a vote in July). (*Id.* at 10). At the meeting, Mendes, speaking in his capacity as a Metro Council member, remarked that

> As the only county-wide elected person in the room, I want to say clearly that's what's been going on at the last couple of meetings, what you guys are doing is pre-baked, political theater designed to feed apparently the ambitions of a small percentage of the county. . . . Y'all know it's a sham and I'm here to tell you guys, you might get away with it tonight, but we see you, we see what you're doing and

---

[6] This fact is not expressly set forth in the amended complaint, but it is easily inferable from what is in the amended complaint.

[7] Though the amended complaint does not specifically state that Plaintiff voted in favor of placing the Second Tax Referendum on the ballot, the Court infers from facts alleged in the amended complaint that Plaintiff did so vote in favor of the referendum. Herein, where the Court notes that the "Commission" voted in a particular way, the Court likewise infers that the "Commission's" vote is reflective of the individual vote of Plaintiff as a member of the Commission.

it's not going to stand one way or the other.… We see what's going on and you shouldn't do it.

(*Id.* at 10–11). On May 25, 2021, the week following the public meeting, John Hicks ("Hicks"), a principal of Baker as well as Baker's general counsel, emailed Plaintiff saying, "we need to have a conversation about the current election commission issues and their impact on the firm's representation of Metro." (*Id.* at 12). Hicks and Plaintiff then met the next day in the Baker offices. (*Id.*). During the meeting, Hicks told Plaintiff that other principals and shareholders of Baker were upset because Metro City Council and the Metro School Board[8] were threatening to pull their business from the firm because of Plaintiff's activity on the Commission. (*Id.*). In response, Plaintiff told Hicks that Hicks's attempts to influence the Commission and Plaintiff could be criminal or illegal under Tennessee law. (*Id.* at 13).

### 4. APPEAL OF THE CHANCERY COURT'S RULING ON THE SECOND TAX REFERENDUM, AND TERMINATION OF PLAINTIFF'S EMPLOYMENT WITH BAKER

In late June 2021, following litigation regarding the Second Tax Referendum, the Davidson County Chancery Court ruled that the Second Tax Referendum was defective and should not be placed on the ballot. (*Id.* at 14). The Commission then scheduled a public meeting for June 25, 2021 to vote on whether to appeal the Chancery Court ruling. (*Id.*). The day before the meeting, Hicks emailed Plaintiff requesting that Plaintiff call him. (*Id.* at 15). During the phone call, Hicks asked Plaintiff not to vote to appeal the ruling on the Second Tax Referendum. (*Id.*). Plaintiff

---

[8] There is a slight discrepancy in the amended complaint as to what entity was the client of Baker during the relevant time periods. The amended complaint states that Metro was the client, whereas other parts of the amended complaint indicate that Baker viewed "Metro City Council" and the "Metro School Board" as distinct clients. Based on the amended complaint as a whole, it is reasonable to infer that Metro (which would encompass Metro City Council and Metro School Board) was a client of Baker's, regardless of whether attorneys at Baker treated or referred to the sub-divisions of Metro as individual clients.

refused to tell Hicks what his vote would be, at which point Hicks said that he wanted to meet with Plaintiff the following morning (the day of the vote). (*Id.* at 16).

Hicks was not the only person who was busy the day before the vote. On June 24, 2021, Mendes sent a letter ("Mendes Letter") to the entire Commission and Metro Council. (*Id.* at 16). The Mendes Letter explicitly called out Plaintiff for his decisions relating to the various tax referendums:

> I do not need to tell any of you how pre-baked the Commission's process was. You lived through it. I believe that you already know that Chair DeLanis's intentions from the start were to push the referendum onto a ballot no matter what. I believe you know that instead of letting unbiased legal advice dictate the conclusion, Chair DeLanis's preferred conclusion dictated what the legal advice was going to be. . . For reasons that seem hyper-partisan, Chair DeLanis didn't like the answers he was getting from Bill Koch, Bob Cooper, or Chancellor Lyle. So Chair DeLanis decided instead to have the Commission fire Bill Koch and get the answers he wanted from Jim Blumstein[.]

(*Id.* at 16).[9] Per their phone call the day prior, Hicks and Plaintiff were set to meet the morning of the vote. That morning, Hicks emailed Plaintiff, "be in the office by 8 or 8:15 at the latest . . . We

---

[9] Jim Blumstein is a professor at Vanderbilt Law School. (Doc. No. 34 at 9). The amended complaint mentions Professor Blumstein in three other places, but any particular relationship of his to the matters at issue herein is unspecified and is immaterial for present purposes.

The Court takes judicial notice of the fact that Bob Cooper, not to be confused with Mayor Cooper (to whom he is unrelated), had served as the Attorney General and Reporter for the State of Tennessee from 2006 to 2014 and was at the time in question in the private practice of law. The amended complaint does not mention Bob Cooper anywhere else; thus, any particular relationship of relationship of his to the matters at issue herein is unspecified and is immaterial for present purposes.

The Court takes judicial notice that Bill Koch is a former justice of the Tennessee Supreme Court, and the amended complaint implies that he served as legal counsel for the Commission before being fired for reasons the amended complaint does not address other than to state that such firing was not dictated by Plaintiff. (Doc. No. 34 at 17). The amended complaint does not otherwise mention Bill Koch, and any particular relationship of his to the matters at issue herein is unspecified in the amended complaint and is immaterial for present purposes.

Finally, the Court takes judicial notice of the fact that Davidson Chancellor Ellen Lyle is the judicial official who ruled that the First Tax Referendum should not be placed on the ballot. The amended complaint does not otherwise mention Chancellor Lyle except in this single quotation, and any particular relationship of hers (beyond the ramifications of her decision regarding the First Tax Referendum) to the matters at issue herein is unspecified in the amended complaint and is immaterial for present purposes.

should talk as early as we can after that." (*Id.* at 18). Apparently concerned about the subject matter of the meeting, Plaintiff responded in part:

> Dear John, Please inform me in writing of the purpose of the meeting. If this meeting is to speak to me again about my vote at the election commission meeting today, I am not comfortable with that. As I have expressed to you before, further discussions of that nature may put the law firm and its clients in a questionable legal position.

(*Id.* at 18). Approximately an hour after sending this email, Hicks emailed Plaintiff to notify Plaintiff that Plaintiff's employment with Baker was going to be terminated. (*Id.* at 18). Hicks gave Plaintiff a choice on how to proceed: work the balance of the fiscal year *and* resign from the Commission or leave Baker immediately. (*Id.* at 18–19).

Three days after Plaintiff was notified that he was going to be terminated, Hicks directed Plaintiff to meet with him at 9:00 A.M. on June 28, 2021. (*Id.* at 19). Early that morning, Plaintiff emailed Hicks, copying the senior management of Baker:

> You have told me several times now that two firm clients (Metro Nashville and the Metro School Board) have been pressuring you, and the firm, to take action against me because of my role on the Election Commission. In my opinion, that implicates serious legal and ethical issues. I should not have to consider those issues is [*sic*] a rushed fashion without the opportunity to consult counsel. Why don't we postpone all this until sometime after the upcoming fourth of July holiday?

(*Id.*). Contrary to Plaintiff's requests, Hicks refused to postpone the meeting until after July 4, 2021 and did not allow Plaintiff to bring an attorney with him to the meeting. (*Id.*). Hicks sent an email to DeLanis at 4:06 PM on June 28, 2021, in which he stated: "The meeting will occur at 8:00 tomorrow. You are still employed by the firm, so please come in to discuss that employment with me, your practice group chair and the office managing shareholder. If you have counsel, he or she is not invited to attend and would not be if the meeting occurred at any other time." (*Id.*).

Hicks and Plaintiff then met on June 29, 2021. (*Id.*). During the meeting, Hicks terminated Plaintiff's employment and gave him until July 2, 2021 (three days hence) to leave the firm. (*Id.*

at 19–20). During the meeting, Hicks stated that had "no choice" but to terminate Plaintiff's employment. (*Id.*). Following the meeting, Hicks emailed Plaintiff stating the following

> Please remember that, as a firm lawyer, Metro Government and the related entities are your clients, as well as the firm's clients. None of us can discuss or comment to third parties on any communications the firm may have had with any of our clients. To do otherwise would be an ethical violation.

(*Id.* at 20).

On July 2, 2021, the day that Plaintiff was slated to leave Baker, but prior to the termination becoming public, Tennessee State Senator Ferrell Haile met with Mayor John Cooper. (*Id.* at 21). During the meeting, Senator Haile expressed his concerns to Mayor Cooper that a private employer of an election commissioner had been pressured by Metro on how to vote on the appeal of the Chancery Court's ruling. (*Id.*). Although Mayor Cooper told Senator Haile that Plaintiff's termination of employment had not come from the mayor's office, the mayor did not otherwise appear concerned about the issues raised by Senator Haile. (*Id.* at 21–22).[10] A few days later, on July 7, 2021, Plaintiff spoke with a member of Baker's Board of Directors ("Baker Board Member"), with whom he had been in touch a few months prior. (*Id.*). The Baker Board Member told Plaintiff that the Baker Board Member had told Hicks that Hicks could not tell an employee how to vote on an issue pending before a board or commission. (*Id.* at 22).

### 5. PLAINTIFF FILES THE INSTANT ACTION

On June 22, 2022, Plaintiff filed the instant action. (Doc. No. 1). Several months later, Plaintiff filed an amended complaint (Doc. No. 34), which is now the operative complaint in this action. The amended complaint names as Defendants Metro, Mendes in his individual capacity

---

[10] The amended complaint does not specifically allege that Mayor Cooper was involved in the decision to terminate Plaintiff, and the Court does not find that what is alleged in the amended complaint is sufficient to support an inference that Mayor Cooper was involved.

and official capacity, and Baker (collectively, "Defendants"). (*Id.*). The amended complaint contains six counts:

- Count I: Violation of the Plaintiff's First Amendment (as incorporated through the Fourteenth Amendment) rights of free speech and freedom of association and due process rights and equal protection rights under the Fourteenth Amendment alleged against Metro and Mendes in his individual capacity and official capacity.

- Count II: Violation of Plaintiff's First Amendment (as incorporated through the Fourteenth Amendment) rights of free speech and freedom of association and due process rights and equal protection rights under the Fourteenth Amendment, and violation of Tennessee Code Annotated §§ 39-14-112, 2-19-202 alleged against Metro and Mendes in his individual capacity and official capacity

- Count III: Joint Action and Civil Conspiracy to violate Plaintiff's constitutional rights alleged against Metro, Mendes in his individual capacity and official capacity, and Baker

- Count IV: Violation of Plaintiff's First Amendment (as made applicable to the States via the Fourteenth Amendment) rights of free speech and freedom of association and Plaintiff's due process rights under the Fourteenth Amendment alleged against Baker as a state actor

- Count V: Retaliatory discharge in violation of Tennessee Code Annotated § 50-1-304 alleged against Baker

- Count VI: Injurious falsehood and interference with business opportunity alleged against Baker

(*Id.* at 34–38). In light of these allegations, Plaintiff requests temporary and permanent injunctions against Metro, Mendes, and Baker (though Plaintiff has not filed a motion for a preliminary injunction or temporary restraining order, as would be necessary to obtain preliminary relief). (*Id.* at 38). He also requests an award of compensatory damages of at $1,000,000, as well as punitive damages. (*Id.*). Finally, Plaintiff requests attorneys' fees and costs as permitted by law. (*Id.*).

On October 6, 2022, Metro and Mendes filed a joint motion to dismiss (Doc. No. 39), accompanied by a supporting memorandum (Doc. No. 40), seeking dismissal in part the amended complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which

relief can be granted. Baker also filed a motion to dismiss (Doc. No. 43), accompanied by a supporting memorandum (Doc. No. 44), seeking dismissal in part of the amended complaint in part under Rule 12(b)(6). Responses and replies have been filed with respect to each of these respective motions, which are ripe for decision.

DISCUSSION

The instant motions to dismiss raise several arguments as to why dismissal of the amended complaint in part is warranted under Rule 12(b)(6). The Court addresses each argument in turn. In broad strokes, the memorandum opinion proceeds as follows. First, the Court addresses Plaintiff's First Amendment-retaliation claim as pled against Metro, Mendes in his official capacity, and Mendes in his individual capacity. The Court also determines whether Mendes is entitled to qualified immunity as to the First Amendment-retaliation claim pled against him in his individual capacity. The Court next turns to whether the amended complaint states a First Amendment-retaliation claim against Baker.

The Court then addresses whether the amended complaint states a claim for a violation of Plaintiff's rights under the Due Process Clause (meaning, here, of the Fourteenth Amendment) and whether Plaintiff has stated a claim for civil conspiracy. Finally, the Court briefly addresses the state-law claims contained in Counts V and VI, which no Defendant has moved to dismiss.

## 1. FIRST AMENDMENT-RETALIATION CLAIM AGAINST METRO, MENDES, AND BAKER

The amended complaint sets forth a First Amendment-retaliation claim against Metro, Mendes in his individual capacity and official capacity, and Baker.[11] Specifically, the amended

---

[11] This claim is variously alleged against the various Defendants across Counts I, II, III and IV. Counts I and II assert liability only as to Metro and Mendes; Baker's liability is asserted only via Counts III and IV. Notably, Counts III and IV respectively assert separate theories for rendering Baker, presumptively a private party rather than a state actor, liable for a violation of the First Amendment. Herein, although

complaint alleges that Plaintiff was retaliated against in violation of the First Amendment for exercising his First Amendment rights of free speech and freedom of association. Defendants have all moved to dismiss the First Amendment-retaliation claim pled against them respectively. The Court addresses the arguments of Defendants in turn below.

A.  Facts Pled Based on "Information and Belief"

Before addressing the merits of the Defendants' motions to dismiss, the Court must first resolve a dispute as to what facts contained in the amended complaint can be treated as true. Metro Defendants argue[12] that facts alleged in the amended complaint based on "information and belief" are not well-pled, and the Court should not take such facts as true in resolving the instant Motion. (Doc. No. 40 at 19).[13] The Court disagrees.

The Court does not dispute that facts based *on sheer speculation* are not well-pled. But the Sixth Circuit has said that pleading facts on "information and belief" may be permissible where a plaintiff "may lack personal knowledge" and therefore must "rely on information furnished by others." *Starkey v. JPMorgan Chase Bank, NA*, 573 F. App'x 444, 447–48 (6th Cir. 2014). As *Starkey* explained, even while holding that the particular plaintiff had made allegations "on

treating the claim as a single claim in certain respects, the Court also includes Defendant-specific analyses regarding the extent to which Plaintiff has plausibly alleged that particular Defendants are liable on such claim.

[12] Although Baker incorporates the arguments of Metro Defendants in its motion to dismiss, for the sake of conciseness the Court will refer to arguments that are substantively discussed only in Metro Defendants' motion as argued by Metro Defendants. However, where a discussion of an argument made only by Metro Defendants (and incorporated by Baker) applies to all Defendants, then the discussion applies to both Metro Defendants' motion to dismiss and Baker's motion to dismiss.

[13] The Court does not begrudge Metro Defendants for making this argument, especially given that some of the most concerning allegations contained in the amended complaint are alleged based on "information and belief."

information and belief that was improper under the particular circumstances at issue, sometimes pleading on information and belief is proper:[14]

> It is true that pleading on information and belief may be permissible in certain circumstances. For example, sometimes a plaintiff may lack personal knowledge of a fact, but have "sufficient data to justify interposing an allegation on the subject" or be required to "rely on information furnished by others."

*Id.* at 447–48 (6th Cir. 2014) (quoting Wright & Miller, 5 *Fed. Prac. & Proc. Civ.* § 1224 (3d ed. 2012)). *Starkey* itself is not precedential, but the Court has no doubt that it accurately states the law in this regard. As the Second Circuit put it, "allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Boykin v. KeyCorp* 521 F.3d 202, 215 (2d Cir.2008).[15] One district court in the Second Circuit has suggested, and the undersigned agrees, that authority for allowing allegations "on information and belief" is provided by Rule 11(b)(3), which "states that '[b]y presenting to the court a pleading, written motion, or other paper-whether by signing, filing, submitting, or later advocating it-an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, *if specifically so identified,* will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.' (emphasis added)." *Lovell v. GEICO Gen. Ins. Co.*, No. 12-CV-00546 A M, 2013 WL 7871497, at *9 (W.D.N.Y. Mar. 29, 2013), *report and recommendation adopted in part*, No. 12-CV-546-A, 2014 WL 917303

---

[14] Interestingly, the problem with those allegations actually was not they that were too speculative, but rather, to the contrary, that they were especially *non-speculative*. That is, they were within the personal knowledge of the plaintiffs and thus were not in fact based on mere "information and belief." *See Starkey*, 573 F. App'x at 447–48.

[15] By the undersigned's count, allegations are made in the amended complaint "on information and belief" twenty-five times, and in each case the alleged facts indeed likely would be peculiarly within the knowledge of one or more of the Defendants. And in ten of those instances, Plaintiff identities statements of Hicks (of which Plaintiff had personal knowledge) as the "information" supporting his belief.

(W.D.N.Y. Mar. 10, 2014). As another opinion in this same district court put it, "[t]he phrase 'specifically so identified' refers to allegations 'upon information and belief'". *Bellavia v. Orleans Cnty.*, No. 1:22-CV-842-JLS-JJM, 2023 WL 2587681, at *2 (W.D.N.Y. Jan. 25, 2023) (citing 2 Matthew Bender, Moore's Federal Practice, § 8.04[4] (3d ed. 2022)), *report and recommendation adopted,* No. 22-CV-842 (JLS)(JJM), 2023 WL 2586267 (W.D.N.Y. Mar. 21, 2023). As the undersigned would summarize it, under certain circumstances, factual allegations in a complaint may be made on information and belief (even without using the longer terminology set forth in Rule 11(b)(3)), albeit with the caveat that the signer of the complaint (counsel or a pro se plaintiff) is certifying compliance with Rule 11(b)(3) when making factual allegations on information and belief.

As the undersigned sees it, there may well be relevant (alleged) facts of which the plaintiff lacks firsthand knowledge but has good reason to believe are true (exist). Often, the plaintiff's good reason to believe that facts exist is the plaintiff's firsthand knowledge of those facts. Other times, however, the plaintiff's good reason is *information furnished by other persons* on which it is reasonable for the plaintiff to rely; under these circumstances, as *Starkey* put it, the plaintiff will have "sufficient data to justify interposing an allegation on the subject." 573 F. App'x at 448. Where such circumstances exist, factual allegations may be made on "information and belief." Alternatively, even absent such circumstances, under certain conditions allegations may be made of alleged facts that would be peculiarly within the knowledge of one or more opposing parties.

The undersigned would summarize the relevant principles in the following way. A fact of which a plaintiff lacks personal knowledge nevertheless *in some situations* can be well-pleaded even if alleged only on "information and belief." Those situations include when the "belief" is reasonable based on the "information," meaning facts known personally to the plaintiff or facts

suggested (directly or by inference) by information from others upon which it is reasonable to rely. The alleging of a fact based on *this* kind of belief is *not* mere speculation, but rather one based on—in particular, the kind of (firsthand and secondhand) information on which the plaintiff properly may rely for purposes of pleading claims. These situations also include when the alleged fact would be peculiarly within the knowledge of one or more opposing parties, although the undersigned must add that he will countenance this alternative only where the allegation (even if not supported as per the first alternative identified immediately above) is not inconsistent with the other alleged facts and not facially implausible. The undersigned's approach here is entirely consistent with the approach of the Second Circuit, except that the undersigned has taken pains to announce a pro-defendant limitation on the propriety as accepted alleged facts on information and belief on the specific ground that the alleged fact would be peculiarly within the knowledge of one or more defendants. *See Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) ("The *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged *upon information and belief* where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.") (emphasis added).

Asserting contrary principles, Metro Defendant misrepresents *16630 Southfield Ltd. P'ship v. Flagstar Bank*, 727 F.3d 502 (6th Cir. 2013)). According to Metro Defendants, "[t]he Sixth Circuit held in 16630 Southfield Limited that by alleging facts 'upon information and belief,' a plaintiff has 'merely alleged their 'belief,' which fails to satisfy *Iqbal*." (Doc. No. 40 at 19) (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank*, 727 F.3d at 506). Notably, by characterizing the Sixth Circuit's statement as referring to what "a" plaintiff—a clear connotation that the reference is to any and all plaintiffs generally—and not what *the* plaintiff in that case had

done, and by omitting a reference to anything case-specific about the Sixth Circuit's holding, Metro suggests incorrectly that the Sixth Circuit there was announcing a (precedential) rule generally applicable to all cases. In fact, the Sixth Circuit was merely stating that the particular allegations made on information and belief particular plaintiff in that case were improper.

And as for the general rule that Metro suggests was announced in *16630 Southfield Ltd. P'ship*, it is a very consequential one: that if facts are alleged based "[up]on information and belief," that "fails to satisfy *Iqbal*." (Doc. No. 40 at 19). That is of course, tantamount to suggesting that under *Iqbal* (and *Twombly*), allegations of fact based "on information and belief" have no proper place in complaints filed in federal civil cases. But as discussed above, this is simply not the law as the undersigned sees it, Setting aside the misleading citation of *16630 Southfield Ltd. P'ship*, Metro Defendants cite no authority to support the existence of such a rule, and cases (including cases, albeit non-precedential ones thus far as far as the undersigned can tell, from this circuit) consistently reject it. *E.g., GlobalTranz Enters. Inc. v. Shipper's Choice Glob. LLC*, No. CV-16-04038-PHX-ROS, 2017 WL 11609546, at *3 (D. Ariz. Feb. 23, 2017) ("[D]istrict courts have squarely rejected the argument that the *Twombly/Iqbal* standard does not allow pleading matters on information and belief. One court noted: 'Even after *Iqbal* and *Twombly*, numerous courts have held that facts may be pleaded on information and belief—especially where, as here, the underlying evidence is peculiarly within the defendant's possession.'") (quoting *GCIU-EMployer Ret. Fund v. Quad/Graphics, Inc*., No. 216CV00100ODWAFMX, 2016 WL 3027336, at *3 (C.D. Cal. May 26, 2016); *Modern Holdings v. Corning Inc.*, 2015 U.S. Dist. LEXIS 41134 at *12, 2015 WL 1481457 (E.D. Ky. 2015) ("While pleading on information and belief cannot

insulate a plaintiff at the 12(b)(6) stage, *Iqbal* did not render pleading on information entirely ineffectual.")

The undersigned has found a few cases stating that "conclusory allegations" based on information and belief are not cognizable under *Iqbal* and *Twombly*. *E.g.*, *Menzel v. Scholastic, Inc.*, No. 17-CV-05499-EMC, 2018 WL 1400386, at *2 (N.D. Cal. Mar. 19, 2018). But that is merely an application of the general rule of *Iqbal* and *Twombly* that conclusory allegations are not cognizable; non-conclusory factual allegations based on information and belief *are* proper under *Iqbal* and *Twombly*. *See id.* ("The Ninth Circuit has held that the *Iqbal/Twombly* plausibility standard does not prevent a plaintiff from pleading facts alleged upon information and belief. But while facts may be alleged upon information and belief, that does not mean that conclusory allegations are permitted. A conclusory allegation based on information and belief remains insufficient under *Iqbal/Twombly*.") (citation omitted).

The undersigned's approach reflects this: to be properly alleged based on "information and belief," facts must be non-conclusory, i.e., (a) inferable from information (i) of which Plaintiff has personal knowledge or (ii) of which Plaintiff has knowledge and on which he can reasonably rely, or (b) indicated directly (rather than by inference) from information of which Plaintiff has knowledge and on which he can reasonably rely. *Floyd v. Buffalo Trace Distillery, Inc.*, No. 320CV00073GFVTEBA, 2021 WL 1113143, at *2 (E.D. Ky. Mar. 23, 2021) ("Under limited circumstances, a claim may be rendered plausible if a plaintiff pleads its "information and belief" with supporting facts.").

As for the facts alleged in the amended complaint challenged by Metro Defendants on the grounds that they were pled merely on "information and belief," as suggested in a footnote above, they are the kinds of facts that would be peculiarly within the knowledge of one or more

Defendants and not of Plaintiff. For example, Metro Defendants seek to make hay out of the fact that the amended complaint alleges only on information and belief that there were Metro officials (including Mendes, but otherwise unnamed) that allegedly attempted to influence Baker's actions by threatening to pull business from the firm. (Doc. No. 40 at 19). These key alleged facts (that there were some persons, and the identity of the specific persons and whether Mendes was one of them) are plainly ones of which two or more Defendants, but not Plaintiffs, would have firsthand knowledge. The Court therefore finds it appropriate to treat this allegation as true, despite it being pled on "information and belief."

The Court likewise treats as true allegations in the amended complaint pled on "information and belief." It does so because each factual allegation satisfies either or both of the alternative bases for properly pleading an allegation based on information and belief.

Because Baker incorporates this argument of Metro Defendants (without providing any further basis to reject Plaintiff's allegations made on information and belief), the Court likewise treats the other allegations pled on "information and belief" as true for the purposes of resolving Baker's motion. With these findings in mind, the Court now turns to whether Plaintiff has stated a First Amendment-retaliation claim against Metro, Mendes in his official and individual capacities, and Baker.

    B. <u>The Amended Complaint Does Not State a Claim Against Metro or Against Mendes in His Official Capacity</u>

In the amended complaint, Plaintiff seeks to hold Metro and Mendes, in his official capacity, liable for various alleged constitutional violations. (Doc. No. 34). Because the claim against Mendes in his official capacity is "essentially a claim against [Metro]" and is based on the same set of facts as the claim against Metro, the same analysis governs the claim as pled against

Metro and Mendes in his official capacity. *See Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016).

To plead a § 1983 claim against a municipality, a litigant must do more than what is required to plead a claim against an individual (typically an official in his or her individual capacity). To succeed on a municipal liability claim, Plaintiff must demonstrate both: "(1) the deprivation of a constitutional right, and (2) [that the municipal entity] is responsible for that violation." *See Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Regarding the bases for finding a municipality liable, The Sixth Circuit has explained with respect to § 1983 claims pled against a municipality,

> [t]o establish municipal liability under *Monell v. Department of Social Services*, a plaintiff has four ways to show that a municipality had a "policy or custom" that caused the violation of his rights. The plaintiff can prove: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

*Barrow v. City of Hillview, Ky.*, 775 F. App'x 801, 814–15 (6th Cir. 2019). But there is another way to establish municipal liability. Perhaps this way—though it involves the *taking or causing* of actions rather than the "ratif[ication]" (after-the-fact) of actions—is properly considered encompassed within option (2), i.e., as a kind (or slight variation of) a ratification of illegal actions by an official with "final decision making authority." As the Sixth Circuit has explained, "a municipality may be held liable under § 1983 for a rights violation when either the municipality had an unlawful policy or practice that caused the rights violation, or a municipal 'policymaker' directly caused the rights violation." *Jorg v. City of Cincinnati*, 145 F. App'x 143, 146 (6th Cir. 2005) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).

Metro Defendants argue that the amended complaint fails to state a § 1983 claim against them. (Doc. No. 40 at 34). In their view, the amended complaint neither alleges the existence of an illegal official policy nor that an official with final decision-making authority ratified illegal actions.[16] (*Id.*). In his response, Plaintiff appears to pursue only the argument that an official with final decision-making authority ratified (or, under the alternative embraced by *Jorg*, caused) the First Amendment violation," relying on *Paige v. Coyner*, 614 F.3d (6th Cir. 2010). (Doc. No. 47 at 44–45).

The amended complaint is devoid of facts plausibly suggesting that anyone responsible for causing the First Amendment violation was exercising policymaking authority bestowed by Metro. The Court keeps in mind that the violation at issue is the *adverse action* visited upon Plaintiff for exercising his First Amendment rights, meaning Metro's action (either directly by way of conspiracy[17] or indirectly by applying pressure to Baker) resulting in Plaintiff's' termination for refusing to buckle to pressure regarding the upcoming vote.[18] So the theory has to be that (i) at least one person (associated with Metro) communicated with Baker in a manner that resulted in Baker terminating Plaintiff; and (ii) in so doing, such person was exercising "authority [under state or local law] to establish municipal policy with respect to the action ordered," and such authority is "final." *Pembaur*, 475 U.S. at 481.

---

[16] Reasonably enough, Metro Defendants did not address whether the amended complaint sets forth a basis for municipal liability based on the third and fourth options for such liability as described in *Barrow*. The amended complaint does not suggest, and Plaintiff does not otherwise contend, that Plaintiff's allegations against Metro Defendants rest on the third or fourth grounds.

[17] The mention here of conspiracy is not intended as a comment on the applicability, if any, of *Monell*'s requirements when a municipality's liability under § 1983 is pursued via a theory of civil-conspiracy liability. *See infra note* 24.

[18] Notably, the violation is *not* creating or aggressively pursuing an Anti-Tax Referendum Policy or putting pressure on Plaintiff to change his vote. To the extent that any party has characterized such conduct as constituting an adverse action against Plaintiff, the Court does *not* find that it rises to the level of an adverse action under the standards applicable to public officials.

"The Sixth Circuit has held that municipal liability may only be imposed [based on the theory that that an official with final decision making authority ratified illegal actions] where the city official was 'acting in a policymaking capacity' at the time the alleged constitutional violation occurred and whose conduct could be characterized as 'exercising a power to set policy.'" *Stone v. City of Grand Junction*, 765 F. Supp. 2d 1060, 1074 (W.D. Tenn. 2011) (quoting *Wooten v. Logan,* 92 Fed. Appx. 143, 146–47 (6th Cir. 2004)). The Sixth Circuit in *Jorg* explained in detail what makes a person a policymaker for the purposes of municipal liability:

> Whether a municipal official is a policymaker depends on the conduct in question; the same official may be a policymaker in some situations but not in others. *Pembaur*, 475 U.S. at 483, 106 S. Ct. 1292. "[N]ot every decision by municipal officers automatically subjects the municipality to § 1983 liability." *Id.* at 481, 106 S. Ct. 1292. Otherwise, the municipal liability standard would be nothing more than a *respondeat superior* standard—a move which has been expressly forbidden by the Supreme Court. *Id.* Accordingly, an official is a "policymaker" only when state or local law *vests* in him the "authority to establish municipal policy with respect to the action ordered," and such authority is "final." *Id. See also Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). "[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 85 L.Ed.2d 791 (1985). Thus, in order for a particular decision by a municipal official to be a "policy" decision, state or local law must give the official the authority to choose from various alternatives when making that particular decision.

*Jorg*, 45 F. App'x at 146–147.

The allegations in the amended complaint—even considering those made only on information and belief—are devoid of any factual matter to plausibly suggest that any such policymaker was responsible for Plaintiff's termination. Even accepting Plaintiff's argument that the Anti-Tax Referendum Policy is a "policy" as contemplated under the municipal liability case law, Plaintiff failed to identify a policymaker upon whom to center his claim. However, the Anti-Referendum Policy actually is not the relevant policy; the policy at issue is the "policy" of communicating with Baker in such a way as to pressure Baker into terminating Plaintiff's

employment. To begin with, the amended complaint is ambiguous as to who such a person may have been. It does not squarely allege that Mendes was such a final policymaker, even if it does suggest that Mendes was someone who (actual under color of law if not actual legal authority) contributed to causing Plaintiff's firing and supported the Anti-Referendum Policy. But supporting a policy and setting that policy are not equivalent. And the Court does not deem it plausible that a single member of Metro's City Council (which, the Court judicially notices, included thirty-nine other members) had such authority or even would have been cloaked with such authority; there is no reason whatsoever that a decision of this kind—to get an employee of a private employer fired in pursuit of Metro's political goals—would have been actually or even ostensibly outsourced to a single council member, let alone outsourced in a manner that reflected that Mendes's decision to do this was *final*.

The amended complaint leaves open the possibility that some unnamed person (other than Mendes) was a final policymaker in this regard. It is sheer speculation to say that in contacting Baker to cause the termination of Plaintiff, such caller amounted to a final policymaker without knowing who this person was, what his or her association with (or position at) Metro was, what authority he or she may actually or even ostensibly had based on the or association or position or anything else. Even if this background information was deemed to be a fact particularly within Defendants' knowledge so as to render it *potentially* appropriate to be pled on information and belief, in the Court's view it  is ultimate not appropriately pled on information and belief because it implausible that state or local law gave the caller "the authority to choose from various alternatives when making that particular decision," inasmuch as the Court has been provided no reason (i) to believe that state or local law would give *anyone* the authority to choose between pressuring a private employer to fire its employee and not pressuring a private employer to fire its

employee; or (ii) to believe that if there is such a person, it was the person who actually contacted Baker to get Plaintiff terminated; or, relatedly, (iii) that the caller was a final decision-maker with respect to the decision to cause Baker to terminate Plaintiff, rather than merely someone of *some influence* at Metro.

The Court therefore agrees that Plaintiff has failed to state a claim of municipal liability for First Amendment retaliation against Metro and Mendes in his official capacity. Plaintiff's First Amendment-retaliation claim against Metro and Mendes in his official capacity will be dismissed.[19]

The Court now turns to whether the amended complaint states a claim of First Amendment retaliation against Mendes in his individual capacity.

    C.  <u>The Amended Complaint States a Claim for First Amendment Retaliation against Mendes in his Individual Capacity</u>

        *i.  Applicable Test*

Before the Court can determine whether Plaintiff has stated a First Amendment-retaliation claim, the Court must first determine what test applies when the conduct prompting the alleged retaliation was undertaken by an appointed official. Generally, to state a claim for First Amendment retaliation, a plaintiff must plead that

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between

---

[19] In light of this finding, Court need not address Metro Defendants' argument that Mendes is entitled to legislative immunity as to the claims pled against him in his official capacity or that the official-capacity claim against Mendes should be dismissed at this early juncture as redundant of the claim against Metro.

elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017).

Metro Defendants argue that the Court should eschew the above-stated three-prong test and should instead take the approach adopted by some out-of-circuit district courts. (Doc. No. 40 at 17–18). Specifically, Metro Defendants urge the Court to follow the rule set forth in *King v. City of New York*, 20-CV-8283, 2022 WL 138009, at *6 (S.D.N.Y. 2022), which requires an elected official pursuing a First Amendment-retaliation claim to demonstrate that the retaliation "strip[ped] them of their office, or their fundamental ability to function in that office." *King* is distinguishable from the present case, however, because there the plaintiff was an elected rather than an appointed official like Plaintiff. Whether this distinction is sufficiently material by itself to disregard *King* in the present case is something the Court need not decide, however. More to the point, contrary to Metro Defendants' suggestion, the Court need not turn to out-of-circuit cases specific to *elected* officials to determine the applicable test for Plaintiff's claim when the Sixth Circuit has analyzed First Amendment claims similar to the one at issue in the instant motions. These cases also involve elected officials, but the Sixth Circuit characterized them as "public officials," making their reasoning applicable to both public and elected officials alike. Accordingly, the Court need not adopt a facially narrower test from out-of-circuit when it can instead rely on Sixth Circuit precedent.

As far as the Court is aware, the Sixth Circuit has on three occasions confronted First Amendment-retaliation claims of public officials for conduct perpetuated at least in part by other public officials. *See Zilich v. Longo*, 34 F.3d 359 (6th Cir. 1994); *Mattox v. City of Forest Park*,

183 F.3d 515 (6th Cir. 1999); *Perkins v. Township of Clayton*, 411 F. App'x 810 (6th Cir. 2011).[20] In each of these cases, the plaintiff-elected official claimed that he or she was subject to adverse actions in response to his or her conduct undertaken as an elected official.

In *Mattox* and *Perkins*, respectively, the Sixth Circuit applied the three-prong test set forth above to determine whether the First Amendment-retaliation claim of the plaintiff, in each case an elected official, could survive summary judgment. In applying the three-prong test in these cases, however, the Sixth Circuit departed slightly from the traditional standards applied to First Amendment-retaliation claims of private individuals. As will be explained in greater detail below, the Sixth Circuit's reasoning focused on the second prong of the test. As to the second prong, the Sixth Circuit emphasized that the test is context-specific and explained that "public officials may need to have a thicker skin than the ordinary citizen when it comes to attacks on their views." *Mattox*, 183 F.3d at 522.

In light of the Sixth Circuit's approach to First Amendment-retaliation claims of public officials, the Court is satisfied that the three-prong test applies to Plaintiff's First Amendment-retaliation claim and that, contrary to Metro Defendants' assertion, it need not resort to out-of-circuit cases to find the applicable standard. As done so by the Sixth Circuit, the Court will focus on the second prong given that Plaintiff's conduct against which he was allegedly retaliated was undertaken in his capacity as an elected official.

As for the Sixth Circuit's analysis in *Zilich*, although the court did not provide a clear framework for its analysis (*i.e.*, such as the three-prong test), nothing in the court's analysis contradicts its approaches taken in *Mattox* and *Perkins*. Furthermore, as will be explained in detail

---

[20] Although these cases all were on appeal from a ruling on summary judgment, the Court finds no reason to stray from the test applied by the Sixth Circuit in these cases. Indeed, the procedural posture of the cases did not affect the test that the Sixth Circuit employed, and the test is perfectly adaptable to the motion-to-dismiss context.

below, in *Zilich,* the Sixth Circuit focused on issues similar to those upon which it focused in *Mattox* and *Perkins*, despite not using the neatly delineated prongs that were employed in the other two cases. Therefore, by following the analytical framework provided in *Mattox* and *Perkins*, the Court is not taking an approach that conflicts with the Sixth Circuit's analysis in *Zilich*.

As for the issues in dispute under the three-prong test in this case, Metro Defendants appear to agree that the amended complaint alleges that Plaintiff was engaged in constitutionally protected speech or activity when he sought to cast his vote as an elected official. Metro Defendants also appear to agree that *if* the amended complaint alleges an adverse action sufficient to meet the second prong, that the third prong (causation) would also be met. So with respect to the three-pronged test, Metro Defendants put all of their metaphorical eggs in one metaphorical basket, relying exclusively on the argument that the second prong is not satisfied because the amended complaint fails to alleged that Plaintiff was subjected to an adverse action that would deter a person (or more accurately, an elected official) of ordinary firmness from continuing to engage in that conduct (*i.e.*, casting his vote). And because Baker does not make any arguments as to the three-prongs beyond what is offered by Metro Defendants, Baker has also put all of its eggs in that same single basket. Therefore, the Court addresses only the second-prong of the three-prong test.

### ii.  Relevant Sixth Circuit Case law: *Zilich*, *Mattox* and *Perkins*

*Zilich*, *Perkins*, and *Mattox* established important guideposts for what the Sixth Circuit considers an action sufficiently "adverse" for purposes of the second prong of a First Amendment-retaliation brought by a public official. The Court therefore provides a discussion of these cases here.

In *Zilich*, the earliest of the three cases, the plaintiff was a former outspoken member of the city council. *See Zilich*, 34 F.3d at 360–361. During his term, the plaintiff spoke out against

the town mayor on a variety of local issues. *See id.* But his willingness to clash with the mayor came at a cost; during his term, the plaintiff's "home was vandalized, his tires were slashed, his car windows were shot out and he and his wife received anonymous phone calls threatening bodily harm." *See id.* In addition to these attacks, there was evidence that during meetings with the mayor and his staff, there was talk of "slapping [the plaintiff] around, hiring someone to break his legs, cutting him because he was a bleeder, and tearing his throat out." *Id.* At 361 (internal quotation marks omitted). In the face of these attacks and threats, the plaintiff did not run for reelection. *Id.* The plaintiff filed suit against the mayor and other officials, claiming that the attacks and threats made against him were unconstitutionally retaliatory under the First Amendment. *Id.* at 360. The district court denied the defendants' motion for summary judgment on this issue, and the Sixth Circuit affirmed.[21] *Id.* at 360, 365.

In agreeing with the district court, the Sixth Circuit found that the defendants were not entitled to qualified immunity. *Id.* at 364. The Sixth Circuit found that the plaintiff's First Amendment right of free speech was "clearly established" because it was "well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional . . . ." *Id.* at 365. The Sixth Circuit went on to explain that "[n]o reasonable official could possibly believe that it is constitutionally permissible to retaliate against a political opponent with physical threats, harassment[,] and vandalism." *Id.* Given that the defendants had not met their burden for their summary judgment motion, the Sixth Circuit affirmed the district court's denial of summary judgment in favor of the defendants. *Id.*

_____

[21] The Sixth Circuit in *Zilich* did reverse in part the district court's ruling on the defendants' motion for summary judgment based on an additional First Amendment-retaliation claim, discussed below, as well as on a different issue that the Court does not find necessary to discuss.

Notably, the plaintiff had raised another First Amendment-retaliation claim that the court did not assess on qualified immunity because the claim failed substantively to state a violation of the plaintiff's First Amendment rights. After his term, the new council had passed a resolution and an ordinance saying he had been unqualified to hold his prior office and that his salary from that time could be collected. *Id.* at 361-62. The plaintiff claimed that these actions were taken in the same plan "to threaten him and to ruin his political career." *Id.* at 362. The court disagreed, saying, "A legislative body does not violate the First Amendment when some members cast their votes in opposition to other members out of political spite or for partisan, political or ideological reasons." *Id.* at 363. Such actions, the court explained, happen "every day," and "[the court] may not invalidate such legislative action based on the allegedly improper motives of legislators." *Id.* The court emphasized that investigations into public officials and resolutions on their conduct occur frequently, often purely out of partisanship, and may themselves be protected speech.

When the court analyzed qualified immunity and denied summary judgment for the claims related to the plaintiff's personal threats and harassment, the court implicitly recognized a distinction between these two First Amendment circumstances. While "The First Amendment is not an instrument designed to outlaw partisan voting or petty political bickering through the adoption of legislative resolutions," *id.*, "[t]he alleged threats of physical violence *outside the legislative arena* by some defendants in response to plaintiff's opposition during his term in office present a different question because '[r]etaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment,'" *id.* at 364 (emphasis added) (some original alterations) (citations omitted).

Five years after the Sixth Circuit decided *Zilich*, the court was once against faced with a district court's summary judgment ruling on an elected official's First Amendment-retaliation

claim. Presenting facts considerably less striking than those in *Zilich*, *Mattox v. City of Forest Park* involved an elected member of the local city council, Brenda Mattox (who was one of several plaintiffs in the case). 183 F.3d 515 (6th Cir. 1999). Mattox served as the chair of the Public Safety Committee, which oversaw the police and fire departments. *See id.* at 517–18. Mattox received concerns from several firefighters, which she then passed along to the city council. *See id.* In response, the city opened an investigation into the concerns. *See id.* A report on the investigation was assembled, but the report contained negative comments about Mattox. *See id.* The police department created a video overview of the report, which played on local television several times before the 1993 city council election. *See id.*

Mattox filed a First Amendment-retaliation claim, alleging that the negative comments were made in retaliation for informing the city council about the concerns. *See id.* In reviewing the district court's grant of summary judgment to defendant, the Sixth Circuit applied the three-prong test for First Amendment-retaliation claims. *See id.* at 520. As explained by the Sixth Circuit, the

> three elements of a retaliation claim are (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Id.* (internal quotation marks omitted). As to whether the district court's summary judgment ruling on Mattox's claim was correct, the Sixth Circuit focused its analysis on the second prong of the three-prong test. The Sixth Circuit explained that its precedent treats discharging or transferring a plaintiff out of that person's job as a "serious adverse action[]." *See id.* at 521. In contrast to these "serious adverse actions," however, Mattox had merely alleged reputational damage. *See id.* According to the Sixth Circuit, although in some cases "humiliation" may be grounds for a First Amendment-retaliation claim, "[a]s an elected official, Mattox voluntarily placed herself open to

criticism of her actions and views on political matters." *Id.* at 522. In light of her voluntary exposure to the public eye, and although the negative comments about her may have been "inappropriate and unfortunate," these comments were not the "type of adverse action against which the First Amendment protects. [being subjected to these comments was] not equivalent to being fired by a government employer for expressing protected views . . . . Public officials may need to have thicker skin than the ordinary citizen when it comes to attacks on their views." *See id.* The Sixth Circuit therefore found that the alleged adverse actions taken against Mattox were not of the type that would "chill a person [or elected official] of ordinary firmness from continuing to engage in the [protected activity]." *Id.* at 520. As suggested by the Sixth Circuit's analysis, elected officials may have to clear a higher bar under the second prong than a private citizen, given that they voluntarily place themselves in the public eye—and thereby voluntarily expose themselves to public comment and criticism.

Finally, more than a decade after the Sixth Circuit decided *Zilich* and *Mattox*, the Sixth Circuit affirmed the district court's summary judgment ruling to defendant in *Perkins v. Township of Clayton*. 411 F. App'x 810 (6th Cir. 2011). The facts of *Perkins* share several similarities with those of *Mattox*, and the Sixth Circuit relied heavily in *Perkins* on its prior reasoning in *Mattox*. The plaintiff in *Perkins* was a former elected treasurer of Clayton County Township. *See id.* The tensions between the plaintiff and other Township officials began when the plaintiff discovered that the Township's elected clerk was receiving discounted cellular telephone plans through the Township. *See id.* at 811–812. The plaintiff brought the issue to the attention of the Township auditors and supervisor, but no action was taken. *See id.* With no response from the other Township officials, the plaintiff turned to the press, which in turn published a series of stories on the conduct raised by the plaintiff. *See id.* at 812. Allegedly in response to the plaintiff's engagement with the

press, the Township took a series of purportedly retaliatory actions. *See id.* For example, the Township voted to hold a censure hearing and filed a complaint for mandamus against the plaintiff in the Michigan state court. *See id.* The plaintiff then filed an action in federal court, alleging First Amendment retaliation. The district court granted summary judgment to the defendant (a Township official) on the grounds that the defendant was entitled to qualified immunity because no constitutional violation had occurred. *See id.* at 813.

Consistent with its approach in *Mattox*, the Sixth Circuit used the three-prong test to analyze the plaintiff's First Amendment-retaliation claim. *See id.* at 814. The Sixth Circuit focused its analysis on the second prong, as the first was not in dispute and the third ultimately did not need to be reached. As the Sixth Circuit explained, "harassment necessary to rise to a level sufficient to deter an individual is not extreme." *See id.* (internal quotation marks omitted). Echoing its decision in *Mattox*, the Sixth Circuit went on to explain that "[t]he objective inquiry into whether the actions taken against an individual rise to the level of an adverse action is highly dependent on context, and [] [the Sixth Circuit] ha[s] repeatedly noted that 'prisoners might have to endure more than public employees, who in turn might have to endure more than the average citizen.'" *Id.* (quoting *Fritz v. Charter Tp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010).

Turning to the plaintiff's claim, the Sixth Circuit found that the actions taken against the plaintiff were no more adverse than those taken against the plaintiff in *Mattox*, and therefore were insufficient to defeat the defendant's motion for summary judgment. *See id.* at 815. As the Sixth Circuit explained, "[l]ike Mattox, Perkins attempted to discharge her duties and was met with opposition. Through the censure hearing, mandamus action, and contempt proceedings, Perkins' colleagues took action that undermined her credibility and fitness for the job, and she ultimately did not run for office again." *Id.* Although the Sixth Circuit acknowledged that the actions taken

against the plaintiff were "unquestionably unpleasant," the "district court correctly determined that none would dissuade a public official of ordinary firmness from exercising his or her First Amendment rights." *Id.*

With this legal landscape in mind, the Court now turns to Plaintiff's First Amendment-retaliation claim.

### iii. Analysis

The Court uses the Sixth Circuit's views regarding the respective conduct in *Zilich*, *Perkins*, and *Mattox* as guideposts in determining whether the allegations contained in the amended complaint would "chill" an ordinary elected official's First Amendment activities. The Court admits that the conduct in none of those cases is nearly a perfect match to the conduct to which Plaintiff (allegedly) was subjected in this case. Ultimately, however, the Court finds that the actions suffered by Plaintiff are more similar to those suffered by the plaintiff in *Zilich* than those suffered by the plaintiffs in *Perkins* and *Mattox* respectively.

The crux of the amended complaint is that Mendes, in addition to other unnamed Metro officials, complained to Baker about how Plaintiff would vote as a member of the Commission (*i.e.*, in favor of appealing the Chancery Court's ruling on the Second Tax Referendum), and that these officials threatened to pull Metro's business from Baker if Baker did not take action against Plaintiff. (Doc. No. 34). As a result of pressure received by Metro, Hicks called Plaintiff and asked him not to vote in favor of the appeal. (*Id.* at 15). Just a few days after that phone call, Plaintiff emailed Hicks saying "[y]ou have told me several times now that two firm clients (Metro Nashville and the Metro School Board) have been pressuring you, and the firm, to take action against me because of my role on the Election Commission." (*Id.* at 19). Soon after Plaintiff sent that email, Plaintiff was notified that his employment with Baker would be terminated. (*Id.*). Prior to the

termination of Plaintiff's employment becoming public, Senator Haile told Mayor Cooper that he was concerned that Metro had pressured the private employer of a Commission member into influencing how that member would vote on the appeal. (*Id.* at 21).

Taken as true for the purposes of Metro Defendants' motion to dismiss, these (alleged) facts plausibly suggest that Mendes and unnamed Metro officials attempted to influence Plaintiff to vote against the appeal. Metro did so by providing Baker with an apparent ultimatum: successfully influence Plaintiff's vote on the Commission or else lose important business. Baker, through Hicks, then repeatedly attempted to influence Plaintiff, imposing increasing pressure until ultimately it was clear that Plaintiff nevertheless would not commit to vote against the appeal. Unable to fulfill Metro's wishes by fostering a change in Plaintiff's upcoming vote, Baker then turned to the second-best option for the firm: terminating Plaintiff.

The Court is satisfied that Metro's (alleged) imposition of pressure on Baker to influence Plaintiff's vote coupled with the termination of Plaintiff's employment are "adverse actions" that would "chill a person [or elected official] of ordinary firmness," at least insofar as is required to overcome a motion to dismiss. True, Plaintiff (very fortunately) did not suffer the same degree of threats and attacks as the plaintiff in *Zilich*. The plaintiff in *Zilich* was subjected to numerous violent attacks against his property and threats of violence against himself and his wife, whereas Plaintiff in this case allegedly was subjected to non-violent actions. But like the plaintiff in *Zilich*, Plaintiff was subjected to serious consequences for their First Amendment activity that went beyond what an elected official (even one with the metaphorical thick skin required for a public official) reasonably would endure before being deterred from exercising his or her First Amendment rights. Indeed, like the adverse actions in *Zilich*, the adverse actions taken against Plaintiff were seemingly designed to cause harm to him in his personal capacity (*i.e.*, his

employment with a private employer) rather than in his official capacity. Termination of Plaintiff's private employment could have severe negative consequences for Plaintiff's personal life and be precisely the kind of thing that would deter a public official of ordinary firmness from exercising his or her First Amendment rights.[22]

The Court's conclusion is bolstered by the Sixth Circuit's analysis in *Mattox* as to the type of conduct constituting a "serious adverse action" under the First Amendment. In *Mattox*, the Sixth Circuit explained that under its precedent in an analogous First Amendment context,[23] "firing," "dismissal," "transfer," "discharge," or "suspension" have constituted "serious adverse actions." *See* 183 F.3d at 521. Here, after Plaintiff allegedly rebuffed numerous attempts by his private employer (as prompted by Metro) to change Plaintiff's vote as a public official, he was fired by that employer.

On the other side of the metaphorical coin, the Court is satisfied that the adverse action taken against Plaintiff goes far beyond what the plaintiffs in *Mattox* and *Perkins* were subjected to respectively. As the Sixth Circuit recognized in *Mattox* and *Perkins*, although the adverse actions were undoubtedly unpleasant for the respective plaintiffs, they were the type of actions that public officials are generally expected to tolerate, much like the First Amendment-retaliation claim in *Zilich* that did not survive summary judgment. Importantly, the actions taken in *Mattox*, *Perkins*, and the failed *Zilich* claim were not facially designed to meddle in the private affairs of the plaintiffs. For example, in *Perkins*, the Township decided to hold a censure hearing and filed a complaint for mandamus against the plaintiff in federal court. *See* 411 F. App'x at 812. In *Mattox*,

---

[22] The Court need not harp on the negative consequences that interference with employment can have on an individual's personal life.

[23] Specifically, the Sixth Circuit explained that its precedent has treated "firing" etc. as "serious adverse actions" in the evaluating the First Amendment rights of public employees. *See Mattox*, 183 F.3d at 521.

the report that was ultimately compiled contained criticisms of the plaintiff, and these criticisms were later aired on television. *See* 183 F.3d at 517–18. In *Zilich*, the resolution attacked his right to have held office. *See* 34 F.3d at 361, 363. These actions, however unfortunate, were ultimately targeted at harming the respective plaintiffs in their capacity as elected officials. In stark contrast to the actions taken in those cases, the adverse actions taken against Plaintiff here naturally affect his personal life and do so likely in a very significant way. In urging that the out-of-circuit *King* rule applies, Metro Defendants argue that Plaintiff has not alleged an adverse action because Plaintiff continued to serve and vote as a public official (Doc. No. 40 at 18). Despite cursorily citing in their briefing to this circuit's case law, Metro Defendants miss the point of that case law[24]: Plaintiff may have continued in his role, but at what cost? What makes an adverse action retaliatory

---

[24] Indeed, the Court does not know whether Metro Defendants were recklessly misleading or were themselves confused about the case law when discussing the state of the Sixth Circuit's case law. (Doc. No. 40 at 16). They cite *King* for the rule that "elected officials enjoy no First Amendment protection from retaliation for political speech unless that retaliation strips them of their office, or their fundamental ability to function in that office."(*Id.*). But the facts of *King* and the Second Circuit cases upon which it relies (and to which Metro Defendants cite) were about interference with or removal from their *public* office or *public* employment. That is not the case here, where Plaintiff was terminated from *private* employment. Perhaps Metro Defendants have misunderstood the adverse action at issue as interfering with Plaintiff's vote, when in fact it is interfering with his private employment to the point of causing termination. Further, in applying its rule, the court in *King* said that "acts of legislative investigation and advocacy [] fail to implicate the First Amendment," 581 F. Supp.3d at 571, in an analysis similar, albeit not identical to that of *Zilich*. And the *King* decision acknowledges upfront that the "foundational principles [that] are at odds" in that case include legislators' policy views on one hand and avoiding "judicial entanglement in 'politically motivated conduct committed *within the confines of the legislatures and best left within the legislative sphere*'" on the other. *Id.* at 569 (emphasis added) (quoting *Camacho v. Brandon*, 317 F.3d 153, 161 (2d Cir. 2003)). The adverse action at issue here—causing the termination of private employment—is squarely outside the legislative sphere and is nothing like the "acts of legislative investigation and advocacy" that were among the adverse actions in *King*.

It is therefore unclear what Metro Defendants think the Sixth Circuit has not considered. Given that they cite to *Mattox* and *Zilich* in their brief, they know that the Sixth Circuit *has* considered the First Amendment protection of elected officials and how it relates to political actions. Insofar as the Sixth Circuit has not considered the termination of a public official, *King* held that the *actionable* retaliatory acts were those that suspended him, rescinded his committee membership, and expelled him from counsel; in stripping him of his office, in accordance with the rule Metro Defendants cite, these actions are more akin to termination than to the legislative actions that did not succeed as bases for the First Amendment-retaliation claim. And insofar as the Sixth Circuit has not considered the termination of a public official from private employment, neither have the courts Metro Defendants cite.

in violation of the First Amendment is that the public official, if he did not give up his office or his voting integrity, objectively should not have been expected to endure the adverse action. So, the actionability of the adverse action here is not dependent on whether Plaintiff kept his office (and his ability to vote and vote in accordance with his conscience).

Further, Metro Defendants are correct that "the First Amendment does not insulate a political official, such as DeLanis, from politicking and opposing viewpoints," (*id.* at 23 n.10 (citing *Mattox*, 183 F.3d at 522)), but they have missed that the adverse action at issue is not mere "politicking," *(*Doc. No. 40 at 23 n.10), or "political bickering," (*id.* at 30 (citing *Mattox*, 183 F.3d at 522; *Zilich*, 34 F.3d at 363); *see also* Doc. No. 40 at 36 (citing *Mattox*, 183 F.3d at 522)), but rather causing the termination of a public official from their *private* employment.[25] The undersigned is unwilling to equate the two. The Court therefore finds that the amended complaint includes allegations, which the Court must take as true, that go beyond what a public official is expected to be able to endure in exercising his or her First Amendment rights. The Court must next address whether Mendes is nonetheless entitled to qualified immunity.

---

[25] Insofar as Metro Defendants allege that Plaintiff has not established causation, the Court is satisfied that Plaintiff has alleged both factual and proximate cause. Among other alleged facts, Plaintiff alleged that Baker "had no reason to terminate DeLanis . . . [i]ts choice to do so was," in part, "in submission to the pressure it was receiving from Metro." (Doc. No. 34 at 22). Additionally, Plaintiff has alleged that Metro's calls to Baker were in the nature of threats, indicating that Metro knew Baker "would not want to jeopardize its working relationship with [Metro Defendants." *Paige*, 614 F.3d at 282. As such, a jury could find Plaintiff's termination a reasonably foreseeable consequence if Metro Defendants' goal was to have Plaintiff fired. *See id.*

D. Mendes (in his Individual Capacity) is Not Entitled to Qualified Immunity

Metro Defendants argue that Mendes[26] is entitled to qualified immunity on Plaintiff's First Amendment-retaliation claim.[27] (Doc. No. 40 at 29). According to Metro Defendants, even if the Court were to conclude that Plaintiff had pled a violation of his constitutional rights, there is no clearly established law that would have put Mendes on notice that his actions violated the First Amendment.[28] (*Id.*).

The defense of qualified immunity properly can be asserted under Fed. R. Civ. P. 12(b)(6). *See, e.g.*, *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016) ("Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity.").[29]

---

[26] Metro plainly is not entitled to qualified immunity, because "qualified immunity is unavailable in § 1983 claims against a municipality." *Moldowan v. City of Warren*, 578 F.3d 351, 392 (6th Cir. 2009).

[27] Because the Court finds below that Plaintiff's Due Process and Equal Protection claims should be dismissed, it need not address whether Mendes would be entitled to qualified immunity for these claims.

[28] The scope of Metro Defendants' qualified-immunity argument is unclear. Metro Defendants suggest that Mendes is entitled to qualified immunity based on what he "actually" is alleged to have done, rather than the allegations asserted on "information and belief." (Doc. No. 40 at 30). A reasonable reading of Metro Defendants' argument is that Metro Defendants do *not* argue in favor of qualified immunity for actions that are pled based on "information and belief." In this sense, it may not be necessary for the Court to determine whether Mendes is entitled to qualified immunity based on such conduct. In an abundance of caution, however, the Court will address whether Mendes is entitled to qualified immunity for all of the factual allegations against him insofar as they support Plaintiff's First Amendment-retaliation claim.

[29] But in noting that the defense of qualified immunity is prone to rejection when asserted as a 12(b)(6) motion, the Sixth Circuit makes clear that the defense indeed can be asserted in that manner. And the Supreme Court has indicated that the defense of qualified immunity ideally would be recognized, if valid, early indeed—before discovery even starts. *See Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) ("[W]e have made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that '"insubstantial claims" against government officials [will] be resolved prior to discovery.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)).

nevertheless, such dismissal actually is rarely appropriate, as the Sixth Circuit explained recently

(in an unpublished opinion, but one relying exclusively on published opinions):

> Although a defendant's "entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (alteration in original) (quotation marks and citations omitted). "The reasoning for our general preference is straightforward: 'Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is "obvious" or "squarely governed" by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not' for purposes of determining whether a right is clearly established." *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)). Therefore, it is generally inappropriate for a district court to grant a 12(c) motion based on qualified immunity. *Wesley*, 779 F.3d at 433; *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

*Kilnapp v. City of Cleveland*, No. 22-4059, 2023 WL 4678994, at *3 (6th Cir. July 21, 2023)

To survive the motion to dismiss on qualified-immunity grounds, the plaintiff must allege

facts that "plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right

that was clearly established [by] law at the time, such that a reasonable [official] would have

known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

Therefore, in analyzing the issue of qualified immunity, the "first step is to determine if the facts

alleged make out a violation of a constitutional right. The second is to ask if the right at issue was

'clearly established' when the event occurred such that a reasonable officer would have known

that his conduct violated it." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir.

2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Although these two steps may be

addressed in either order, both steps must be answered in the affirmative for the plaintiff's claim

to proceed. *Id.* (citing *Pearson*, 555 U.S. at 236).

Because the Court has determined that Plaintiff has stated a claim for a violation of

Plaintiff's First Amendment rights, the Court need only address here whether the law was clearly

established such as to have put a reasonable official on notice that the actions taken against Plaintiff were unconstitutional. Plaintiff has the burden of demonstrating that the law was clearly established at the time of the challenged conduct. *See Hughes v. City of North Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996). The inquiry into whether a right was clearly established must be conducted "in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . [and] in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Edwards v. Williams*, 170 F. Supp. 2d 727, 735 (E.D. Ky. 2001) (explaining that a plaintiff must show "that any officials in the defendants' positions, measured objectively, would have clearly understood that they were under an affirmative duty to refrain from the conduct."). The Sixth Circuit has instructed that "[w]hen determining whether a constitutional right is clearly established, [district courts should] look first to decisions of the Supreme Court, then to [Sixth Circuit] decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012) (citing *Masters v. Crouch*, 872 F.2d 1248, 1251–52 (6th Cir. 1989)). While it is not necessary for there to be a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. *See Mullenix v. Luna*, 36 S. Ct. 305, 308 (2015); *Pike v. Hester*, 891 F.3d 1131, 1141 (9th Cir. 2018) (explaining that the "clearly established" prong does not require an "exact factual match").

The alleged events underlying Plaintiff's First Amendment-retaliation claim occurred between June 2020 and June 2021. The Court therefore limits its review of the relevant case law to cases decided prior to June 2020. As discussed in detail above, the Sixth Circuit's treatment of

First Amendment retaliation claims when the relevant First Amendment activity was undertaken in a person's capacity as an elected official differs from treatment of such claims when the First Amendment activity was undertaken in a person's private capacity. The Court therefore agrees with Metro Defendants that in undertaking the "clearly established" analysis, the Court should consider only First Amendment-retaliation cases involving plaintiffs allegedly subject to retaliation for First Amendment activity undertaken in his or her capacity as a public official.

As noted above, a constitutional right is clearly established if (and only if) a "reasonable official would understand that what he is doing violates that right . . . [and the violation is apparent] in the light of preexisting law." *Anderson*, 483 U.S. at 640. Here, the Court's discussion above of the Sixth Circuit's decisions in *Zilich*, *Perkins*, and *Mattox* is relevant. In *Zilich*, the Sixth Circuit made clear that threats of physical violence and attacks on personal property are the type of adverse actions that would chill a reasonable elected official's First Amendment activity. *See Zilich*, 34 F.3d at 360–61. In denying qualified immunity, the Sixth Circuit explained that "[n]o reasonable official could possibly believe that it is constitutionally permissible to retaliate against a political opponent with physical threats, harassment[,] and vandalism." *Id.* at 364–65. True, in *Mattox* and *Perkins*, the Sixth Circuit found that the adverse actions taken against the respective elected officials were not sufficiently adverse to violate the First Amendment. *See Mattox*, 183 F.3d at 522; *Perkins*, 411 F. App'x at 815. However, in distinguishing the facts in *Mattox* from situations in which an action *would* be sufficiently adverse as to violate the First Amendment, the Sixth Circuit noted that the actions taken against Mattox were "not equivalent to being fired by a government employer for expressing protected views." *Mattox*, 183 F.3d at 522. In doing so. the Sixth Circuit suggested that termination of employment in retaliation for exercising a First Amendment right would violate the First Amendment.

The amended complaint alleges, and the Court takes as true, that Mendes leveraged Metro's status as a client with Baker to attempt to influence Plaintiff's vote on the Commission, *i.e.*, chill his exercise of his First Amendment rights. The Court recognizes that the underlying facts supporting the allegation that Mendes (among others) was behind such alleged attempts is not overwhelming. But the alleged facts easily support the factual allegation that *someone* at Metro (*not* to say a final policymaker at Metro) was behind such an attempt. (*See, e.g.*, Doc. No. 34 at 19 (alleging that DeLanis emailed to Hicks, "You have told me several times now that two firm clients (Metro Nashville and the Metro School Board) have been pressuring you, and the firm, to take action against me because of my role on the Election Commission.")). And the amended complaint contains sufficient factual allegations of Mendes' strong feelings about what the vote should be and Mendes's disdain for Plaintiff—to render at least minimally plausible the notion that Mendes was (at least one person) behind the alleged attempt.

Although Mendes' actions do not rise to the level of the threats and attacks at issue in *Zilich*, the Court is satisfied that the law at the time of Mendes' actions would have put a reasonable official on notice that his or her conduct was violative of Plaintiff's First Amendment rights. At the very least it is plausible that this is the case, and thus this case does not present the exception where dismissal on qualified-immunity grounds is appropriate under Rule 12(b)(6). Therefore, in light of the Sixth Circuit's decisions in *Zilich*, *Mattox*, and *Perkins*, the Court finds it plausible that at the time that the conduct in the amended complaint took place, it was clearly established through Sixth Circuit precedent that terminating a public official's private employment in retaliation for how they chose to vote in their public role violates the First Amendment.[30] Plaintiff has therefore

---

[30] Again, the Court need not decide at this time whether the underlying theory of liability for termination is that Mendes was the actor that directly caused the termination or that he conspired with Baker to cause the termination, or both.

met his burden in demonstrating the "clearly established" prong of qualified immunity; it follows

that Mendes is not entitled to qualified immunity. Metro Defendants' motion to dismiss will

therefore be denied insofar as it requests dismissal of Plaintiff's First Amendment-retaliation claim

as pled against Mendes in his individual capacity.

     E.  <u>The Amended Complaint States a Claim for First Amendment Retaliation Against</u>
<u>Baker</u>

Section 1983 applies only to individuals acting under the color of state law. *See McNeese*

*v. Vandercook*, 1999 WL 133266, at \*1–2 (6th Cir. Feb. 25, 1999). "A person acts under color of

state law when he exercises power possessed by virtue of state law and made possible only because

the wrongdoer is clothed with the authority of state law." *Id.* (internal quotation marks omitted).

Individuals acting under the color of state law are often referred to as "state actors." A private

entity typically cannot be held liable under § 1983, because it does not act under the color of state

law, and therefore is not considered a "state actor." As the Sixth Circuit has explained, however,

> [A] private entity can qualify as a state actor in a few limited circumstances—
> including, for example, (i) when the private entity performs a traditional, exclusive
> public function, *see, e.g., Jackson* [*v. Metro. Edison Co.*], 419 U.S. at 352–354, 95
> S. Ct. 449 [(1974)]; (ii) when the government compels the private entity to take a
> particular action, *see*, *e.g., Blum v. Yaretsky*, 457 U.S. 991, 1004–1005, 102 S. Ct.
> 2777, 73 L.Ed.2d 534 (1982); or (iii) when the government acts jointly with the
> private entity, *see, e.g.*, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–942, 102
> S. Ct. 2744, 73 L.Ed.2d 482 (1982).

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). Baker does not argue

that the amended complaint should be dismissed because it was not a state actor. (Doc. No. 44).

Instead, it argues that, assuming it *was* a state actor, it is nonetheless entitled to qualified immunity

on the same grounds for which Mendes is purportedly entitled to qualified immunity. (*Id.* at 2–3).

Because Baker provides no argument as to why it was not a state actor when it undertook the

actions set forth in the amended complaint, the Court need not to address at this juncture whether Baker was in fact a state actor.

And in any event, qualified immunity is not available to Baker, because Baker is an entity rather than an individual. The "[qualified-immunity] defense is available only to individual government officials sued in their personal capacity. Just as the defense is unavailable to the public entity itself, it is unavailable to a private entity acting in a governmental capacity." *Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135, 143–44 (6th Cir. 2023) (citations and internal quotation marks omitted).

Alternatively, because the Court has already found that Mendes is not entitled to qualified immunity, it would be satisfied that Baker is likewise not entitled to qualified immunity even if qualified immunity were potentially available to a private entity. "For the reasons the Court concluded qualified immunity was inappropriate for the individual defendant[ ], it also concludes qualified immunity is inappropriate for [the private-entity defendant, Baker]." *United Pet Supply, Inc. v. City of Chattanooga*, 921 F. Supp. 2d 835, 860 (E.D. Tenn. 2013). Baker's motion to dismiss (Doc. No. 43) will therefore be denied as to Plaintiff's First Amendment-retaliation claim.

## 2. DUE PROCESS CLAIM

Metro Defendants argue that the amended complaint fails to state a claim of a violation of either substantive or procedural due process.[31] (Doc. No. 40 at 24). The amended complaint alleges that Plaintiff had a right to "due process under the law. . . to serve on a commission. . . to effectively

---

[31] Metro Defendants also argue that the amended complaint fails to state a claim under the Equal Protection Clause. (Doc. No. 40 at 24). Plaintiff does not respond to Metro Defendants' argument on this issue. Plaintiff has therefore conceded any opposition to Metro Defendants' argument on this point. Plaintiff's claims of violations of the Equal Protection Clause in Counts I and II of the amended complaint will therefore be dismissed.

fulfill his oath of office. . . [and] to consider and vote on matters coming before the Commission without illegal or inappropriate influence or duress. . . ." (Doc. No. 34 at 26).

Upon its review of the amended complaint, the Court notes that the amended complaint does not expressly indicate whether Plaintiff seeks to pursue a procedural due process claim, a substantive due process claim, or both. As the undersigned put it decades ago, "a substantive due process violation occurs when the government deprives a person of a protectable interest . . . under unconstitutional criteria." Eli J. Richardson, *Eliminating Double-Talk from the Law of Double Jeopardy*, 22 Fla. St. U. L. Rev. 119, 163 (1994). By contrast, "[t]he idea behind procedural due process—including in the context of a state-created liberty interest—is that the interest cannot be taken away arbitrarily. Instead, a state-created liberty interest can be taken away, if at all, only pursuant to procedures reasonably geared (under the circumstances) to obtaining an *accurate* determination as to whether, under applicable criteria, it should be taken away." *See Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673, 683 (M.D.T.N. 2020).

In his response to Metro Defendants' motion to dismiss, Plaintiff provides grounds (without stating them in the alternative) for both a substantive due process claim and a procedural due process claim.[32] (Doc. No. 47 at 25–28). It is the Court's view, however, that substantive due process and procedural due process are not merely alternative theories on which to sustain a single due process claim. Instead, they are *distinct* claims. Therefore, if Plaintiff wished to assert a due process claim, he should have pled the claim such as to clearly indicate whether it was a procedural or substantive due process claim, and then provided argument in response to the instant motions consistent with the claim pled. By failing to do so, Plaintiff has put Metro Defendants in the unfair

---

[32] In particular, Plaintiff's assertion of a substantive due process claim is set forth at Parts (V)(A)-(B) of his brief in opposition to Metro Defendants' motion to dismiss, and Plaintiff's assertion of a claim of procedural due process is set forth at Part V(C) of that response.

position of ostensibly having to defend against two different claims (procedural due process and substantive due process) without *either* of these claims being clearly pled in the amended complaint.

"Under Fed. R. Civ. P. 8(a)(2), plaintiff is required to provide a 'short and plain statement of the claim showing that the pleader is entitled to relief.' Fed. R. Civ. P. 8(a)(2). The complaint must put the defendant on notice as to the plaintiff's claim and its grounds, but the complaint need not contain all of the particularities of the claim." *Salatin v. Trans Healthcare of Ohio, Inc.*, 170 F. Supp. 2d 775, 781 (N.D. Ohio 2001) (citing *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir. 1976)). As explained above, the amended complaint does not put Metro Defendants on notice of whether Plaintiff seeks to bring a substantive or procedural due process claim. And Plaintiff's attempt to provide a substantive due-process argument *and* a procedural due-process argument in support of the single due process claim pled in the amended complaint affirms the Court's view. Because Plaintiff's due process claim fails to put Metro Defendants on notice of the claim against them, the Court agrees with Metro Defendants that the claim should be dismissed. Plaintiff, however, may seek leave to file an amended complaint, should he wish to pursue a due process claim. To the extent that the amended complaint pleads a due process claim against Baker (which appears to be the case), this claim is likewise dismissed with leave to amend.

### 3. CIVIL CONSPIRACY CLAIM AGAINST METRO, MENDES IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES, AND BAKER

Count III of the amended complaint contains a claim of civil conspiracy under Section 1983 against Metro, Mendes in his official and individual capacities, and Baker for allegedly conspiring to violate Plaintiff's constitutional rights. (Doc. No. 34 at 38). Metro Defendants seek dismissal of the civil conspiracy claim pled against them. (Doc. No. 40).

"A § 1983 civil conspiracy claim requires (1) a single plan existed, (2) [defendants] shared in the general conspiratorial objective to deprive [plaintiffs] of [their] constitutional . . . rights, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to [plaintiffs]." *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 767–68 (6th Cir. 2020) (internal quotation marks omitted). But this begs the question of what is meant here by a § 1983 civil conspiracy *claim*. What is *not* meant is a *separate cause of action*. As is very well established, "a Section 1983 civil conspiracy by itself does not constitute a separate cause of action." *Quezergue v. Gunn*, No. 3:22-CV-00092, 2022 WL 1217237, at *4 (M.D. Tenn. Apr. 25, 2022). Instead, "a claim for civil conspiracy under § 1983 exists only where the plaintiff has established a separate and actionable constitutional injury." *Rapp v. Dutcher*, 557 F. App'x 444, 450 (6th Cir. 2014). Or, to put it only slightly more explicitly, a Section 1983 civil conspiracy claim exists only when there is a separate and actionable constitutional violation that injures the plaintiff. *See Wiley v. Oberlin Police Dep't,* 330 F. App'x 524, 530 (6th Cir. 2009).

To illustrate what this all actually means, the Court will contrast this federal (Section 1983) civil law principle with federal criminal law. Under certain circumstances, participation in a conspiracy (to commit a particular underlying federal crime) *standing alone* is actionable under federal criminal law—i.e., is grounds for federal criminal liability irrespective of any whether the underlying crime that was object of the conspiracy was committed, irrespective of whether any actions at all were actually undertaken towards committing that crime, and irrespective of whether anyone (or society as a whole) was injured as a result of the conspiracy or the underlying crimes that was its object.[33] By contrast, participation in a conspiracy to violate Section 1983 by itself is not grounds for civil liability.

---

[33] This is true, for example, of a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 and of a conspiracy to commit so-called Hobbs Act robbery in violation of 18 U.S.C. § 1951.

In short, a § 1983 civil conspiracy "claim" is not a separate cause of action, which is to say that a theory of civil conspiracy does not serve to support a separate cause of action. The question, then, is what exactly a claim of civil conspiracy *does* serve to do. This Court provided an answer many years ago, and it remains the correct answer:

> the doctrine of civil conspiracy may be used in a [Section] 1983 case to extend liability for a deprivation of constitutional rights to persons other than the actual wrongdoer. In such a case, the conspiracy standing alone does not give rise to liability; rather it is the injury to the plaintiff caused by specific overt acts that is actionable.

*Croushorn v. Bd. of Trs. of Univ. of Tenn.*, 518 F. Supp. 9, 43 (M.D. Tenn. 1980) (citations omitted). The idea in the context of a Section 1983 civil-conspiracy claim is the same as the one described by the undersigned in connection with a claim of civil conspiracy under Tennessee law: properly conceived, a "claim of civil conspiracy not as the assertion of a separate cause of action, but rather as an assertion that each of the Defendants should be held liable based on the alleged tortious conduct of the alleged co-conspirators." *JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, 615 F. Supp. 3d 750, 781 (M.D. Tenn. 2022).

The upshot of all of this, although courts typically do not seem to put it exactly this way in adjudicating motions to dismiss a "claim" of civil conspiracy, is that there actually is *no cause of action* for civil conspiracy that even could be dismissed. The only thing that could be dismissed is the *theory* that each of the Defendants is liable, as a co-conspirator of both of its respective co-Defendants, for any Section 1983 violations committed by the other Defendants. Based on courts' consistent past practice, the Court is satisfied that dismissal of a conspiracy theory of liability is a kind of relief properly awardable on a motion to dismiss under certain circumstances, and Plaintiff does not appear to dispute that. The present question is whether such circumstances exist in the present case.

To summarize, Plaintiff's "claim" of Section 1983 civil conspiracy is actually a theory for extending liability under Section 1983 to Defendants (even if they themselves did not take actions that are properly deemed violations of Section 1983) who participated in a conspiracy with a Defendant who did take actions that violated Section 1983. To the extent that the amended complaint does not adequately allege that a particular Defendant violated Section 1983, the theory is simply inapplicable because there is no liability to extend to other Defendants. As noted above, the amended complaint does not adequately state a claim against Metro or against Mendes in his official capacity, and so the claim of civil conspiracy is simply inapplicable to any such claim. The Court need not purport to "dismiss" the claim of civil conspiracy to the extent that it is based on the alleged Section 1983 liability of Metro or Mendes in his official capacity; it is more accurate to say simply that the claim is inapplicable, and cannot be used to extend such liability (to Baker or to Mendes in his official capacity), because such liability has not been adequately alleged.

However, as noted above, the amended complaint *does* adequately allege Section 1983 claims against Baker and against Mendes in his individual capacity. The questions, then, are: (i) whether the amended complaint plausibly alleges that Baker's co-Defendants conspired with Baker to commit Baker's alleged violation of Section 1983; and (ii) whether the amended complaint plausibly alleges that Mendes's co-Defendant's conspired with Mendes's to commit Mendes's alleged violation of Section 1983.

In their briefing, Defendants do not address these issues at all. Instead, they argue only that Plaintiff has not adequately pled an underlying Section 1983 violation as is necessary to support a claim of conspiracy.[34] The Court takes this argument to heart; as noted above, to the extent that

---

[34] Notably, the Court does not perceive that Defendants have argued that the requirements of *Monell* apply to a civil-conspiracy theory of liability for a municipality under § 1983. That is, they do not argue that in order to sustain a civil-conspiracy theory of liability against a municipality, a plaintiff must show that the

this is true (as it is with respect to the claims against Metro and against Mendes in his official capacity), Plaintiff's conspiracy theory will go nowhere. But Defendants have not even attempted to explain why, to the extent the Court finds that Plaintiff has adequately pled an underlying Section 1983 violation (as it has with respect to Baker and to Mendes in his official capacity), Plaintiff's allegations do not adequately support a civil conspiracy theory to extend liability on either such claim to the respective two co-Defendants. Thus, the civil conspiracy theory will not be dismissed with respect to the two surviving underlying Section 1983 claims (i.e., the claim of First Amendment retaliation against Mendes and the claim of First Amendment retaliation against Baker).[35]

### 4. STATE LAW CLAIMS CONTAINED IN COUNT II

Metro Defendants argue that Plaintiff has failed to state claims under Tennessee Code §§ 39-14-112 and 2-19-202. (Doc. No. 40 at 27). In his response, Plaintiff clarifies that he did not intend to plead violations of these state laws. (Doc. No. 47 at 29). Rather than seeking to plead violations of these state laws, Plaintiff explains that he included the argument that Metro Defendants' conduct violated these state laws in the amended complaint to bolster his assertion that Metro Defendants' conduct was not a legitimate exercise of governmental power—which, in

---

act of conspiracy (i.e., entering into an agreement to commit a § 1983 violation with someone who is primarily liable for the § 1983 violation) was the result of a policy or custom of the municipality. Therefore, the Court has not considered whether the amended complaint should be dismissed based on an alleged failure to plausibly allege factual matter to support such a showing.

[35] To reiterate, as for the underlying Section 1983 claims that do not survive (namely, those against Metro and against Mendes in his official capacity), *dismissal* of the conspiracy theory as such is unnecessary because it is simply inapplicable to such claims.

his view, support his § 1983 claims.[36] In any case, given that Plaintiff has indicated that he does not seek to pursue state law claims, the Court need not address whether he could in fact do so.

5. **STATE LAW CLAIMS CONTAINED IN COUNTS V AND VI**

Counts V and VI plead multiple state-law torts against Baker. Baker has not moved to dismiss these claims, and therefore they remain pending.

CONCLUSION

For the reasons (and to the extent) set forth herein, Metro Defendants' motion to dismiss at Doc. No. 39 will be granted in part and denied in part, and Baker's motion to dismiss at Doc. No. 43 will be granted in part and denied in part.

Specifically, Metro Defendants' motion to dismiss (a) will be granted in that (i) all claims against Metro and Mendes in his official capacity will be dismissed, provided that Metro and Mendez in his official capacity[37] will remain potentially liable on the theory of civil conspiracy for any First Amendment retaliation for which Baker or Mendes in his individual capacity is liable; and (ii) Plaintiff's claims of due process and equal protection violations will be dismissed; and (b) otherwise will be denied (including that, as just noted, Metro and Mendes will remain potentially

---

[36] Plaintiff's allegations are not specific enough to conclude that Mendes violated a specific law, and therefore a First Amendment-retaliation claim could not stand on these claims alone. Because he nevertheless plausibly alleged a First Amendment-retaliation claim based on other alleged facts, he can, of course, bolster or change his theory of liability as new facts arise in the course of litigation.

[37] The Court is aware that the parties (reasonably enough) dispute whether it would be premature to dismiss any claims (or, in this case, *theories*) against Mendes in his official capacity as duplicative of the claims (or theories) against Metro. As the Court discerns no possible prejudice from declining to dismiss Mendes in his official capacity at this time, it will decline to do so, without prejudice to Metro Defendants prerogative to re-raise this possibility at any time upon a showing of good cause (including actual prejudice to Metro Defendants any continued deferral of the issue).

liable on the theory of civil conspiracy for any First Amendment retaliation for which Baker or Mendes in his individual capacity is liable).

Baker's motion to dismiss (a) will be granted in that Plaintiff's claims of due process and equal protection violations will be dismissed; and (b) otherwise will be denied (including that Baker will remain potentially liable on the theory of civil conspiracy for any First Amendment retaliation for which Mendes in his individual capacity is liable).

A corresponding order will be entered separately.


_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE